[Cite as *State v. McCray*, 2014-Ohio-2289.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  | JUDGES: |
|---|---|---|
| STATE OF OHIO | : | Hon. W. Scott Gwin, P.J. |
|  | : | Hon. John W. Wise, J. |
| Plaintiff-Appellee | : | Hon. Patricia A. Delaney, J. |
|  | : |  |
| -vs- | : |  |
|  | : | Case No. 2013CA00133 |
| MICHAEL J. MCCRAY | : |  |
|  | : |  |
| Defendant-Appellant | : | O P I N I O N |


CHARACTER OF PROCEEDING:         Criminal appeal from the Stark County
                                 Court of Common Pleas, Case No. 2013-
                                 CR-00290

JUDGMENT:                        Affirmed



DATE OF JUDGMENT ENTRY:          May 27, 2014

APPEARANCES:

For Plaintiff-Appellee                    For Defendant-Appellant
JOHN D. FERRERO                           ANTHONY KOUKOUTAS
PROSECUTING ATTORNEY                      116 Cleveland Avenue N.W.
BY: RENEE WATSON                          808 Courtyard Centre
Assistant Prosecuting Attorney            Canton, OH 44702
110 Central Plaza South, Ste. 510
Canton, OH  44702-1413

*Gwin, P.J.*

{¶1} Appellant Michael McCray ["McCray"] appeals his convictions and sentences after a jury trial in the Stark County Court of Common Pleas on one count of murder and one count of felonious assault.

### *Facts and Procedural History*

{¶2} Late on December 14, 2012, McCray and his girlfriend Miranda Lynn met up with Jermaine Taylor and his girlfriend Maria Gamble at Frame's, a bar in Canton. The two couples drank until the bar closed. All four then climbed into Gamble's Trailblazer and relocated to The Friendly Corner on 15th Street in Canton.

{¶3} Kyle Mills' family owns the Friendly Corner. Gamble and Mills had once dated. Before the group could enter the bar, it was necessary for McCray and Taylor to first obtain permission from Mills for Gamble to enter in the company of another man. Mills gave his blessing and the two couples entered the bar.

{¶4} At the door, bouncer Dwayne Jackson patted McCray down and discovered a knife. McCray was advised he had to leave the knife at the door or take it outside. McCray initially elected to leave the knife with Jackson, but then returned shortly to claim it, went outside for about 10 minutes and returned without the knife.

{¶5} The four ordered drinks and hung out for about 30 minutes before Gamble went to the restroom. On her way back to her seat, Mills stopped her, whispered "nigger lover" in her ear and poured beer over her head. The bouncers and the bar owner's sister, Jennifer Williams, stepped in to diffuse the situation. All patrons were then asked to leave the bar.

{¶6} After the patrons were ejected from the bar, another fight erupted in the parking lot between McCray, Taylor and several other men. Bouncer Aaron Hamfick set about breaking it up. Lynn got in the middle of the fight and Hamrick saw a light-skinned black man punch her. Hamrick tossed the man backwards and told him to leave "before the law shows up."

{¶7} Williams was outside while this was going on and saw Lynn involved in the fight. Williams knew Lynn and was concerned for her safety. She saw Lynn get punched and fall to the ground. Williams extracted Lynn from the fray and got her to Gamble's truck.

{¶8} Taylor managed to extract himself from the fight and run to Gamble's vehicle where the women were waiting. He got in the driver's seat and drove up beside McCray who was still fighting. Before McCray got into the Trailblazer, he announced to the crowd he would be back to kill whoever punched Lynn.

{¶9} While all this was going on, Russell "Joey" Young was staggering around outside, falling-down drunk. He was not part of the fight involving McCray and Taylor, but at one point, Williams observed McCray screaming at Young demanding to know why Young "hit [his] bitch." Once the fight broke up and McCray and company left, Hamrick told Young he needed to go home and steered him towards his Chevy Suburban.

{¶10} Taylor sped away from the Friendly Comer with Gamble in the passenger seat and McCray and Lynn in the back seat. He drove to his mother's house to get rid of some drugs he was carrying. Gamble took over driving again and went back to the bar.

{¶11} Gamble pulled up in the alley by the bar. The four spotted Young in the parking lot sitting in the driver's seat of the Suburban with the door open. McCray leapt out of the vehicle and approached the Suburban, knife in hand. Taylor followed. Taylor and Young "had words" and Taylor punched Young in the face. Young "didn't seem like he wanted to fight" so Taylor returned to the Trailblazer.

{¶12} McCray, however, slashed the tires on the passenger side of the Suburban. He then went after Young. McCray stabbed Young several times in the thigh, his face and eye, and in the neck. In the process, McCray cut his own hand open. He then slashed the driver's side tires. Finally, he went to the passenger side of the vehicle, removed the ignition key and left Young.

{¶13} Returning to Gamble's Trailblazer, McCray got in the backseat behind Gamble and exclaimed, "What the fuck did I just do?" He started crying and talked about killing himself as Gamble sped away. When Gamble got to Navarre Street, McCray and Lynn got out of the truck and took off running.

{¶14} Meanwhile, a woman pounded on the door at the Friendly Comer and alerted those inside that there was a man in the alley dying. Williams and others ran out to investigate. Williams observed a young man lying in the alley in a hooded sweatshirt so blood-soaked, she initially thought it was red. She then recognized the man as Young. Williams, an LPN, rendered what assistance she could until EMS arrived.

{¶15} Young was transported to Aultman hospital where he later died of massive blood loss.

{¶16} McCray and Lynn went to Cynthia Besozzi's home. Besozzi is Lynn's grandmother. Besozzi cleaned and dressed a cut on McCray's hand that he said he

received in a fight. The cut was deep, and she encouraged him to go to the hospital because it needed stitches. McCray declined, stating he did not like hospitals. Besozzi put a patch and butterflies on the wound and wrapped it.

{¶17} Canton Police Officer Jeff Weller processed the crime scene at The Friendly Corner. He noted two blood trails. One leading from the Suburban to the front door of an adjacent home and from that home to the alley where Young was found. He also noted the flattened tires on the Suburban and that there appeared to be blood around the slash marks in the tires on the driver's side. Weller further observed two separate patches of blood on the front passenger side door, one on the door handle and one near the door handle. Weller took swabs of the blood he observed on the Suburban and sent them to the crime lab for analysis.

{¶18} Sergeant Victor George also responded to the crime scene. In attempting to identify Young, George learned that the Suburban was registered to a John Coburn and Young had the vehicle because he was doing some repair work on the vehicle for Coburn. He also gathered information that resulted in the identification of McCray, Taylor, Lynn and Gamble as those involved in Young's death.

{¶19} On December 17, 2012, George located Taylor and Gamble and took them into custody. He also impounded Gamble's Trailblazer.

{¶20} Canton Police crime scene investigator Thomas Wasilewski processed the Trailblazer. The rear driver's side seat appeared bloodstained in three areas. Wasilewski cut those areas out of the seat and sent them to the crime lab for analysis. He did not observe blood in any other area of the vehicle.

{¶21} On December 24, 2012, McCray appeared with his attorney at the Canton Police Department to turn himself in. Sergeant George noted that McCray had a healing laceration on his right hand, Crime scene officer Randy Weirich photographed McCray's hands and obtained a DNA standard from McCray.

{¶22} P.S. Sreenivasa Murthy, M.D. performed an autopsy on Young. Murthy concluded that the primary cause of death was multiple stab wounds with exsanguinations and the secondary cause was acute alcohol intoxication. Murthy further concluded that the manner of death was homicide. He sent a dried blood sample to the crime lab for DNA comparison.

{¶23} Criminalist Jennifer Creed of the Canton-Stark County Crime Lab performed DNA comparison and testing on the crime scene swabs and the bloodstained fabric swatches from Gamble's vehicle.

{¶24} State's exhibits 3A-3D and 4 are the swabs taken by Officer Weller from the exterior of the Chevy Suburban. McCray is the source of the bloodstains on the front driver's side tire (Exhibit 3D) and driver's side passenger door (Exhibit 4). The blood collected from the rear driver's side tire (Exhibit 3C) contained a mixture of two DNA profiles and both McCray and Young possible contributors to that mixture.

{¶25} There were two bloodstains on the exterior passenger side of the Suburban. Officer Weller collected State's Exhibit 3A from the front door handle, McCray is the source of that stain. State's Exhibit 3B was collected from the front door and Young is the source of that stain. Young was the source of the bloodstains on the front seats of the Suburban as well as the blood trails outside the vehicle.

{¶26} State's Exhibits 6A-6D are the pieces of fabric excised from the rear seat of Gamble's Trailblazer. McCray is the source of those stains. Officers were unable to locate the murder weapon.

{¶27} As a result of his actions, the Stark County Grand Jury indicted McCray on one count of murder and one count of felonious assault. At trial, the state presented 12 witnesses. McCray testified on his own behalf.

{¶28} At trial, McCray admitted he sliced the tires on the Suburban, but claimed the purpose was not rendering Young helpless. Rather, he claimed he vandalized the vehicle because he knew it was Coburn's truck and he and Coburn have a stormy history. He denied stabbing anyone, and claimed he sliced his hand open when he tried to stab the tire tread instead of the sidewall, causing his hand to slide down the knife.

{¶29} According to McCray, Taylor killed Young while McCray was busy flattening the tires. McCray testified that he sliced the passenger side tires, first rear, then front and cut his hand slicing the first tire.

{¶30} McCray explained how his blood got on the passenger side door. McCray claimed it was while he was cutting the front passenger tire that he "heard a commotion" on the other side of the vehicle and instead of just looking over the hood, opened the passenger side door to see what was happening. This is when he claimed he first noticed Young and that he and Taylor are engaged in a shouting match. McCray stated he then walked to the driver's side and sliced the front tire before pulling Taylor away from Young. McCray testified he observed blood squirting out of Young's neck and Taylor was covered in Young's blood.

{¶31} McCray testified that he was the first one to return to the Trailblazer. He claimed he watched Taylor strip off his blood-soaked t-shirt as he walked in front of the truck before getting into the front passenger side vehicle, holding the blood-soaked shirt in his lap. Yet he told the jury he never saw Taylor with a knife and no blood was found in the front seat.

{¶32} After hearing all the evidence and deliberating, the jury convicted McCray as charged. The state agreed that felonious assault and aggravated murder were allied offenses that would merge for sentencing and elected to proceed to sentencing on the murder charge. The court subsequently sentenced McCray to incarceration for 15 years to life.

### Assignment of Errors

{¶33} McCray raises four assignments of error,

{¶34} "I. THE TRIAL COURT COMMITTED PLAIN ERROR BY NOT GIVING ADMONITIONS EVERY TIME THE JURY WAS GIVEN A RECESS AND ALLOWED TO LEAVE THE COURTROOM.

{¶35} "II. THE APPELLANT RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS TRIAL ATTORNEY FAILED TO OBJECT TO THE LACK OF ADMONITIONS GIVEN TO THE JURY.

{¶36} "III. THE DEFENDANT'S CONVICTIONS FOR MURDER AND FELONIOUS ASSAULT WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE.

{¶37} "IV. THE DEFENDANT'S CONVICTIONS FOR MURDER AND FELONIOUS ASSAULT WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

I.

**{¶38}** In his first assignment of error, McCray complains that the trial court erred when it failed to properly admonish the jury before every recess in accordance with R.C. 2945.34.

**{¶39}** McCray did not object and therefore failed to preserve his claim. Accordingly, this Court may analyze the error in this case pursuant to the Crim.R. 52(B) plain error analysis. As the United States Supreme Court observed in *Puckett v. United States*, 526 U.S. 129, 129 S.Ct. 1423, 173 L.Ed.2d 266, (2009),

> "If an error is not properly preserved, appellate-court authority to remedy the error (by reversing the judgment, for example, or ordering a new trial) is strictly circumscribed. There is good reason for this; "anyone familiar with the work of courts understands that errors are a constant in the trial process, that most do not much matter, and that a reflexive inclination by appellate courts to reverse because of unpreserved error would be fatal."

556 U.S. at 134. (Citation omitted).

> [A]n appellate court may, in its discretion, correct an error not raised at trial only where the appellant demonstrates that (1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.

{¶40}  *United States v. Marcus,* 560 U.S. 258, 130 S.Ct. 2159, 2164,176 L.Ed.2d 1012 (Internal quotation marks and citations omitted). The Ohio Supreme Court pertinently addressed when structural error analysis should be used in *State v. Perry,*

> We emphasize that both this court and the United States Supreme Court have cautioned against applying a structural-error analysis where, as here, the case would be otherwise governed by Crim.R. 52(B) because the defendant did not raise the error in the trial court. *See Hill*, 92 Ohio St.3d at 199, 749 N.E.2d 274; *Johnson*, 520 U.S. at 466, 117 S.Ct. 1544, 137 L.Ed.2d 718. This caution is born of sound policy. For to hold that an error is structural even when the defendant does not bring the error to the attention of the trial court would be to encourage defendants to remain silent at trial only later to raise the error on appeal where the conviction would be automatically reversed. We believe that our holdings should foster rather than thwart judicial economy by providing incentives (and not disincentives) for the defendant to raise all errors in the trial court-where, in many cases, such errors can be easily corrected.

101 Ohio St.3d 118, 802 N.E.2d 643, 2004–Ohio–297, ¶23. Thus, the defendant bears the burden of demonstrating that a plain error affected his substantial rights and, in addition that the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings. *United States v. Olano*, 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508(1993); *State v. Perry*, 101 Ohio St.3d at 120, 802 N.E.2d 643. Even if the defendant satisfies this burden, an appellate court has discretion to disregard the error. *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240(2002); *State v. Long*, 53 Ohio

St.2d 91, 372 N.E.2d 804(1978), paragraph three of the syllabus; *Perry, supra*, at 118, 802 N.E.2d at 646.

{¶41} R.C. 2945.34 states,

> If the jurors are permitted to separate during a trial, they shall be admonished by the court not to converse with, nor permit themselves to be addressed by any person, nor to listen to any conversation on the subject of the trial, nor form or express any opinion thereon, until the case is finally submitted to them.

{¶42} The failure by a court to perform its statutory duty of admonishing the jury concerning their conduct while separated during the trial, does not constitute reversible error, where it is not shown that the jury were in fact guilty of misconduct or indiscretions and where it further appears that counsel for plaintiff in error observed the omission and did not call the attention of the court to the omission. *Warner v. State*, 104 Ohio St. 38, 135 N.E. 249(1922), syllabus; *accord, Kolotich v. State*, 104 Ohio St. 156, 157, 135 N.E.2d 544(1922); *State v. Eidi*, 6th Dist. Lucas No. L-92-104, 1994 WL 30511(Feb. 4, 1994); *State v. Hall*, 8th Dist. Cuyahoga No. 34522, 1976 WL 190785( Jan. 29, 1976).

{¶43} The record in the case at bar shows that the jury was thoroughly informed, at the beginning of the trial and several times thereafter, of its obligation not to discuss the case or to make any final decision about the case until the jury was excused for deliberation.

{¶44} McCray has no evidence that any member of the jury violated the restrictions established in R.C. 2945.25. McCray has demonstrated no prejudice resulting from the error.

{¶45}  McCray's first assignment of error is overruled.

II.

{¶46}  In his second assignment of error, McCray contends his trial counsel rendered ineffective assistance when he failed to object to the trial court's incomplete or absent jury admonitions.

{¶47}  The standard for reviewing claims for ineffective assistance of counsel was set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674(1984). Ohio adopted this standard in the case of *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373(1989). These cases require a two-pronged analysis in reviewing a claim for ineffective assistance of counsel.

{¶48}  First, we must determine whether counsel's assistance was ineffective; i.e., whether counsel's performance fell below an objective standard of reasonable representation and violate any of his essential duties to the client. If we find ineffective assistance of counsel, we must then determine whether the defense was actually prejudice by counsel's ineffectiveness such that the reliability of the outcome of the trial is suspect. This requires a showing that there is a reasonable probability that but for counsel's unprofessional error, the outcome of the trial would have been different. We apply the *Strickland* test to all claims of ineffective assistance of counsel, either trial counsel, or appellate counsel. *State v. Blacker,* 5th Dist. No. 2005-CA-41, 2006-Ohio-5214.

{¶49}  Recently, the United States Supreme Court discussed the prejudice prong of the *Strickland* test,

It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." Id., at 693, 104 S.Ct. 2052. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id., at 687, 104 S.Ct. 2052.

"Surmounting Strickland's high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. ——, ——, 130 S.Ct. 1473, 1485, 176 L.Ed.2d 284 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland*, 466 U.S., at 689–690, 104 S.Ct. 2052. Even under de novo review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." Id., at 689, 104 S.Ct. 2052; *see also Bell v. Cone*, 535 U.S. 685, 702, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S., at 690, 104 S.Ct. 2052.

*Harrington v. Richter,* __U.S.__, 131 S.Ct. 770, 777-778, 178 L.Ed.2d 624(2011).

**{¶50}** "'The failure to object to error, alone, is not enough to sustain a claim of ineffective assistance of counsel.'" *State v. Fears*, 86 Ohio St.3d 329, 347, 715 N.E.2d 136(1999), *quoting State v. Holloway*, 38 Ohio St.3d 239, 244, 527 N.E. 2d 831(1988). *Accord, State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶233. A defendant must also show that he was materially prejudiced by the failure to object. *Halloway*, 38 Ohio St.3d at 244, 527 N.E.2d 831.

**{¶51}** As noted in our disposition of McCray's first assignment of error, McCray has no evidence that any member of the jury violated the restrictions established in R.C. 2945.25. McCray has demonstrated no prejudice resulting from the error.

**{¶52}** Because we have found no instances of prejudice in this case, we find McCray has not demonstrated that he was prejudiced by trial counsel's performance.

**{¶53}** McCray's second assignment of error is overruled.

### III & IV

**{¶54}** Because McCray's third and fourth assignments of error each require us to review the evidence, we shall address the assignments collectively.

**{¶55}** McCray's third assignment of error challenges the sufficiency of the evidence; his fourth assignment of error contends his convictions are against the manifest weight of the evidence produced by the state at trial. Specifically, McCray contends the state failed to prove he was the man who assaulted Young. McCray further contends that because there was conflicting testimony as to who actually assaulted Young, the jury lost its way when it convicted him of the offenses.

**{¶56}** Our review of the constitutional sufficiency of evidence to support a criminal conviction is governed by *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), which requires a court of appeals to determine whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id.; see also *McDaniel v. Brown*, 558 U.S. 120, 130 S.Ct. 665, 673, 175 L.Ed.2d 582(2010) (reaffirming this standard); *State v. Fry*, 125 Ohio St.3d 163, 926 N.E.2d 1239, 2010–Ohio–1017, ¶146; *State v. Clay*, 187 Ohio App.3d 633, 933 N.E.2d 296, 2010–Ohio–2720, ¶68.

**{¶57}** Weight of the evidence addresses the evidence's effect of inducing belief. *State v. Thompkins*, 78 Ohio St.3d 380, 386-387, 678 N.E.2d 541 (1997), *superseded by constitutional amendment on other grounds as stated by State v. Smith,* 80 Ohio St.3d 89, 684 N.E.2d 668, 1997-Ohio–355. Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue, which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief." (Emphasis sic.) Id. at 387, 678 N.E.2d 541, quoting Black's Law Dictionary (6th Ed. 1990) at 1594.

**{¶58}** When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "'thirteenth juror'" and disagrees with the fact finder's resolution of the conflicting

testimony. Id. at 387, 678 N.E.2d 541, quoting *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). However, an appellate court may not merely substitute its view for that of the jury, but must find that "'the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, supra, 78 Ohio St.3d at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717, 720–721(1st Dist. 1983). Accordingly, reversal on manifest weight grounds is reserved for "'the exceptional case in which the evidence weighs heavily against the conviction.'" Id.

> "[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts.
>
> * * *
>
> "If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment."

*Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191–192 (1978).

{¶59} McCray does not dispute that the victim died of multiple stab wounds. He admits that he was at the bar at the time of the incident. McCray did not claim self-defense or provocation. McCray admitted that he possessed a hunting knife while in the parking lot of the bar. McCray testified that he did demand to know "who hit his bitch."

McCray's main argument is there was insufficient evidence to identify him as the assailant in the stabbing of Russell Young.

{¶60}  Aaron Hamrick testified that he heard McCray say, "We'll be back and who ever hit my girl friend, I'm gonna kill." (2T. at 232). Testimony was presented that McCray and Taylor fought with the victim. Maria Gamble testified that upon returning to the bar after the initial confrontation, McCray had a knife in his hand upon leaving her vehicle. (2T. at 185). Gamble testified that when McCray returned to the vehicle he was upset, crying and saying, "What the fuck did I just do?" (2T. at 185) He further talked of killing himself. (2T. at 185; 262).

{¶61}  State's exhibits 3A-3D and 4 are the swabs taken by Officer Weller from the exterior of the Chevy Suburban. McCray is the source of the bloodstains on the front driver's side tire (State's Exhibit 3D) and driver's side passenger door (State's Exhibit 4). The blood collected from the rear driver's side tire (State's Exhibit 3C) contained a mixture of two DNA profiles and both McCray and Young possible contributors to that mixture. (4T at 414; 418-421).

{¶62} There were two bloodstains on the exterior passenger side of the Suburban. Officer Weller collected State's Exhibit 3A from the front door handle, McCray is the source of that stain. State's Exhibit 3B was collected from the front door and Young is the source of that stain. (4T at 415-418; State's Exhibit 16A).

{¶63} Young was the source of the bloodstains on the front seats of the Suburban as well as the blood trails outside the vehicle. (4T. at 422-425; State's Exhibit 16A).

**{¶64}** If the state relies on circumstantial evidence to prove an essential element of an offense, it is not necessary for "such evidence to be irreconcilable with any reasonable theory of innocence in order to support a conviction." *State v. Jenks*, 61 Ohio St.3d 259, 272, 574 N.E. 2d 492(1991), paragraph one of the syllabus, *superseded by State constitutional amendment on other grounds as stated in State v. Smith*, *80 Ohio St.3d 89, 684 N.E.2d 668(1997).* "Circumstantial evidence and direct evidence inherently possess the same probative value [.]" *Jenks*, 61 Ohio St.3d at paragraph one of the syllabus. Furthermore, "[s]ince circumstantial evidence and direct evidence are indistinguishable so far as the jury's fact-finding function is concerned, all that is required of the jury is that i[t] weigh all of the evidence, direct and circumstantial, against the standard of proof beyond a reasonable doubt." *Jenks*, 61 Ohio St.3d at 272, 574 N.E. 2d 492. While inferences cannot be based on inferences, a number of conclusions can result from the same set of facts. *State v. Lott*, 51 Ohio St.3d 160, 168, 555 N.E.2d 293(1990), citing *Hurt v. Charles J. Rogers Transp. Co*, 164 Ohio St. 329, 331, 130 N.E.2d 820(1955). Moreover, a series of facts and circumstances can be employed by a jury as the basis for its ultimate conclusions in a case. *Lott,* 51 Ohio St.3d at 168, 555 N.E.2d 293, citing *Hurt,* 164 Ohio St. at 331, 130 N.E.2d 820.

**{¶65}** Viewing the evidence in a light most favorable to the prosecution, we conclude that a reasonable person could have found beyond a reasonable doubt that McCray committed the crimes of murder and felonious assault. We hold, therefore, that the state met its burden of production regarding each element of the crimes of murder and felonious assault, and, accordingly, there was sufficient evidence to support McCray's convictions for murder and felonious assault.

**{¶66}** As an appellate court, we are not fact finders; we neither weigh the evidence nor judge the credibility of witnesses. Our role is to determine whether there is relevant, competent and credible evidence upon which the fact finder could base his or her judgment. *Cross Truck v. Jeffries*, 5th Dist. Stark No. CA–5758, 1982 WL 2911(Feb. 10, 1982). Accordingly, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Construction*, 54 Ohio St.2d 279, 376 N.E.2d 578(1978). The Ohio Supreme Court has emphasized: "'[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts. * * *.'" *Eastley v. Volkman*, 132 Ohio St.3d 328, 334, 972 N.E. 2d 517, 2012-Ohio-2179, *quoting Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191–192 (1978). Furthermore, it is well established that the trial court is in the best position to determine the credibility of witnesses. *See, e.g., In re Brown*, 9th Dist. No. 21004, 2002–Ohio–3405, ¶ 9, *citing State v. DeHass*, 10 Ohio St .2d 230, 227 N.E.2d 212(1967).

**{¶67}** Ultimately, "the reviewing court must determine whether the appellant or the appellee provided the more believable evidence, but must not completely substitute its judgment for that of the original trier of fact 'unless it is patently apparent that the fact finder lost its way.'" *State v. Pallai*, 7th Dist. Mahoning No. 07 MA 198, 2008-Ohio-6635, ¶31, *quoting State v. Woullard*, 158 Ohio App.3d 31, 2004-Ohio-3395, 813 N.E.2d 964 (2nd Dist. 2004), ¶ 81. In other words, "[w]hen there exist two fairly reasonable views of

the evidence or two conflicting versions of events, neither of which is unbelievable, it is not our province to choose which one we believe." *State v. Dyke*, 7th Dist. Mahoning No. 99 CA 149, 2002-Ohio-1152, at ¶ 13, *citing State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125(7th Dist. 1999).

**{¶68}** The weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212(1967), paragraph one of the syllabus; *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶118. *Accord, Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *Marshall v. Lonberger*, 459 U.S. 422, 434, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983).

**{¶69}** The jury as the trier of fact was free to accept or reject any and all of the evidence offered by the parties and assess the witness's credibility. "While the jury may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence." *State v. Craig*, 10th Dist. Franklin No. 99AP-739, 1999 WL 29752 (Mar 23, 2000) *citing State v. Nivens*, 10th Dist. Franklin No. 95APA09-1236, 1996 WL 284714 (May 28, 1996). Indeed, the jury need not believe all of a witness' testimony, but may accept only portions of it as true. *State v. Raver*, 10th Dist. Franklin No. 02AP-604, 2003-Ohio-958, ¶21, *citing State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964); *State v. Burke*, 10th Dist. Franklin No. 02AP-1238, 2003-Ohio-2889, *citing State v. Caldwell*, 79 Ohio App.3d 667, 607 N.E.2d 1096 (4th Dist. 1992). Although the evidence may have been circumstantial, we note that circumstantial evidence has the same probative value as direct evidence. *State v. Jenks, supra.*

{¶70} We find that this is not an "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, *quoting Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717. The jury neither lost his way nor created a miscarriage of justice in convicting McCray of the charges.

{¶71} Based upon the foregoing and the entire record in this matter, we find McCray's convictions were not against the sufficiency or the manifest weight of the evidence. To the contrary, the jury appears to have fairly and impartially decided the matters before them. The jury as a trier of fact can reach different conclusions concerning the credibility of the testimony of the state's witnesses and McCray. This court will not disturb the jury's finding so long as competent evidence was present to support it. *State v. Walker*, 55 Ohio St.2d 208, 378 N.E.2d 1049 (1978). The jury heard the witnesses, evaluated the evidence, and was convinced of McCray's guilt.

{¶72} Finally, upon careful consideration of the record in its entirety, we find that there is substantial evidence presented which if believed, proves all the elements of the crimes beyond a reasonable doubt.

{¶73} McCray's third and fourth assignments of error are overruled.

{¶74} The judgment of the Stark County Court of Common Pleas is affirmed.


By Gwin, P.J.,

Wise, J., and

Delaney, J., concur