[Cite as *State v. Haywood*, 2023-Ohio-1121.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## COLUMBIANA COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

TERRANCE L. HAYWOOD,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 21 CO 0035**

---

Criminal Appeal from the
Court of Common Pleas of Columbiana County, Ohio
Case No. 2020 CR 436

**BEFORE:**
Cheryl L. Waite, Carol Ann Robb, Mark A. Hanni, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Dave Yost*, Ohio Attorney General and *Atty. Micah R. Ault*, Assistant Ohio Attorney General, 615 West Superior Avenue, 11th Floor, Cleveland, Ohio 44113, for Plaintiff-Appellee

*Atty. James R. Wise*, 91 West Taggart, P.O. Box 85, East Palestine, Ohio 44413, for Defendant-Appellant.

Dated: March 31, 2023

---

**WAITE, J.**

{¶1} Appellant Terrance L. Haywood was convicted by a jury for the murder of his former girlfriend Destiny Moody and Appellant was sentenced to twenty-four years to life in prison. On appeal, he raises five assignments of error. His first assignment of error, relating to the testimony of the victim's minor son, alleges that the trial court failed to conduct a thorough in camera voir dire of the child prior to trial. While Appellant is correct, due to the other extensive evidence proving Appellant's guilt the error does not rise to the level of prejudicial and reversible error. Appellant also argues that video evidence did not have a proper foundation, admonitions to the jury to refrain from talking about the case were insufficient, Appellant's trial counsel was ineffective, and that there was cumulative error at trial requiring reversal. There is no merit to any of these other arguments, and the judgment of the trial court is affirmed.

## Factual History

{¶2} On October 21, 2019, twenty-six-year-old Destiny Moody, the victim in this case, was working at McDonald's in Wellsville, Ohio. She ended her shift at 11:39 p.m. and drove the short distance to her apartment at 407 Main Street in Wellsville. Her friend Citasia Tisdale was watching Moody's two children at Moody's apartment while the victim was at work.

{¶3} Appellant had been dating Moody for about a year and one-half, and was staying at her apartment. Appellant is not the father of Moody's children. On or about September 22, 2019, Appellant was with Moody at a bar in West Virginia. Apparently the two argued, and he hit her until she was unconscious and fell to the ground. (10/21/21 Tr., p. 843.) A few days before the shooting, Moody told two of her friends that if anything

happened to her, to look to Appellant as the perpetrator. (10/20/21 Tr., p. 673; 10/21/21 Tr., p. 858.)

{¶4} Appellant spent the evening of October 21, 2019, with Michelle Byers at the New Dimension Bar in East Liverpool. They left the bar in separate cars on October 22, 2019 at 12:20 a.m. Appellant was driving a 2008 GMC Acadia SUV. They drove their cars to the victim's apartment in Wellsville and arrived at 12:29 a.m. Byers then continued on to her own home.

{¶5} A few minutes after arriving at the victim's apartment, Appellant left to pick up two friends one block away. Appellant drove them to a location a short distance away. Appellant returned to the victim's apartment at 1:16 a.m.

{¶6} At 2:21 a.m., a surveillance camera from Cindy Mick's house across the street from the victim's apartment captured the sound of a gunshot being fired. Seconds later, a surveillance camera from My Bar, also across the street from the victim's apartment, recorded Appellant running out of the back of her apartment. Both of these cameras also recorded Appellant kicking in the front door of the victim's apartment at 2:32 a.m. A shoe print taken from the victim's front door had the same tread size and design as Appellant's. Surveillance footage also captured Appellant hiding numerous items in an alley behind the house.

{¶7} Five phone calls were made from Moody's cellphone between 2:44 a.m. and 2:54 a.m.

{¶8} Citasia Tisdale gave contradictory testimony about the events around the time of the murder. She had an arrangement with the victim that they would from time to time watch each other's children, and she was watching two of the victim's children, along

with her own daughter, the night of the murder. She testified that she was awake well past 3:00 a.m., but claimed to know nothing of the murder, which occurred at 2:21 a.m., until she awoke the next morning. She claimed to have found Moody in the morning lying on the first floor with a head wound, not moving. Tisdale showed no emotion when the police arrived. She did not tell the police that she had contacted Appellant that night through text messages and phone calls several times prior to calling 911, but she did later admit to that at trial. She also communicated with Appellant on Facebook, but then deleted the messages. One message stated: "Remove these messages when we are done." (10/19/21 Tr., p. 473.) In another message Appellant asked Tisdale to find some guns he had left at Moody's apartment. (10/19/21 Tr., p. 474.) Tisdale called 911 at 10:06 a.m. that morning.

{¶9} The police arrived quickly. The victim had a bullet wound on the right side of her forehead and had no pulse. The police found a shell casing on the floor. They found that the front door had been kicked in, and the door had a shoe impression on it. They took a print of the shoe impression.

{¶10} Police recovered a firearm holster lying near the victim's body. The holster was sent to the state BCI lab for DNA analysis, and resulted in a match with Appellant's DNA.

{¶11} Moody and Appellant had engaged in numerous arguments prior to the murder, and Moody had been trying to get Appellant to move out of the apartment. When Moody arrived home from work the night prior to her death, she posted a message on Facebook that she was single.

**{¶12}** A few hours after the murder Appellant went to the house of a former girlfriend, Sadie Allen. Appellant told Allen that he had been to Moody's house after going to the New Dimension Bar and that he and Moody had been arguing.

**{¶13}** Several days after the murder, the police searched the alley behind Moody's apartment and found a firearm, a gun magazine, and a bag of ammunition. Police returned the next day and recovered a firearm from the roof of a neighbor's garage. The firearm from the roof was identified as the murder weapon. Investigators located photographs of both weapons on Appellant's Facebook page.

**{¶14}** There is an overwhelming amount of video evidence in this case. Police recovered surveillance video from My Bar across the street from the victim's apartment. It captured much of what happened outside the victim's residence the night of the murder. Appellant was identified in that video as the person arriving in the GMC Acadia at Moody's apartment.

**{¶15}** Police also recovered video from Nick's Pizza, which is a few doors away from the victim's apartment. Additionally, police recovered video from the Fraternal Order of Eagles in Wellsville, which is a short distance from the victim's apartment. Police recovered video from Kwik King convenience store, located close to the victim's apartment. Again, police recovered video from the New Dimension Bar in East Liverpool. These videos tracked the movements of Appellant and his vehicle that evening as well as the movements of various witnesses.

**{¶16}** Police recovered video from the Wellsville High School football stadium. Witness Sadie Allen's home was recorded in this video. The video showed Appellant's GMC Acadia at Allen's home the morning after the murder.

Case No. 21 CO 0035

**{¶17}** A few months after the murder, the victim's minor son J.M. told his uncle Dustin Emler that "[h]is daddy shot his mommy." (Tr., p. 872.) A week later, J.M. drew a picture of a woman with a pool of blood around her and J.M. said "she got shot." (Tr., p. 873.) Many months later, J.M. told social worker Courtney Wilson that "his dad shot her." (Tr., p. 899.) J.M. told Wilson that he saw his mom lying on the ground in a great deal of blood, that he had heard his mom and dad arguing, and that he saw a gun. J.M. was four years old at the time. At trial, J.M. could not identify Appellant in the courtroom, but did identify a photo of Appellant as his dad.

### Case History

**{¶18}** On November 18, 2020, Appellant was indicted on the following five counts: murder pursuant to R.C. 2903.02(A), and unclassified felony, with a firearm specification; aggravated burglary pursuant to R.C. 2911.11(A)(2), a first degree felony, with a firearm specification; tampering with evidence under R.C. 2921.12(A)(1), third degree felony; and having a weapon while under a disability pursuant to R.C. 2923.13(A)(3), third degree felony. A five-day trial commenced on October 18, 2021. Before jury selection, the state dismissed the aggravated burglary charge and the corresponding gun specification. On October 22, 2021, the jury returned a verdict of guilty on all remaining charges and specifications. On November 3, 2021, the court sentenced Appellant to fifteen years to life in prison on the murder conviction, three years consecutive on the firearm specification, three years consecutive for tampering with evidence, and three years consecutive for having a weapon under a disability. The total sentence was twenty-four years to life in prison. The sentencing judgment entry was filed on November 4, 2021. The notice of appeal was filed on November 12, 2021.

**{¶19}** Appellant presents five assignments of error on appeal.

ASSIGNMENT OF ERROR NO. 1

THE TRIAL COURT ERRED IN ALLOWING THE TESTIMONY OF [J.M.].

**{¶20}** On August 2, 2021, the court held an in camera hearing to determine the competency of J.M., the victim's six-year-old son, to testify about events he witnessed when the crime occurred. J.M. was four years old at the time of the crime. J.M. testified at trial that his "dad" shot his mommy. (Tr., p. 882.) Appellant is not J.M.'s biological or legal father. It is this testimony, combined with the fact that the trial judge failed to ask J.M. any questions about the crime during the in camera voir dire, that form the basis of this assignment of error. Appellant argues that the failure to ask questions about the crime at the voir dire, combined with J.M.'s actual testimony, constitute reversible error.

**{¶21}** Evid.R. 601 states that "[e]very person is competent to be a witness except as otherwise provided in these rules." Although prior versions of the rule contained a provision expressly dealing with children under ten years old, the current rule does not. On the other hand, R.C. 2317.01 states: "All persons are competent witnesses except those of unsound mind and children under ten years of age who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly." Therefore a "trial court must conduct a voir dire examination of a child under ten years of age to determine the child's competence to testify." *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 100. In this voir dire the court must consider: (1) the child's ability to receive accurate impressions of fact or to observe acts about which he or she will testify, (2) the child's ability to recollect

those impressions or observations, (3) the child's ability to communicate what was observed, (4) the child's understanding of truth and falsity and (5) the child's appreciation of his or her responsibility to be truthful. *Id.* citing *State v. Frazier*, 61 Ohio St.3d 247, 251, 574 N.E.2d 483 (1991). The competency review refers to the time of trial rather than the time of the crime or subject matter of the testimony. *State v. Clark*, 71 Ohio St.3d 466, 470-471, 644 N.E.2d 331 (1994). The competency determination is reviewed on appeal for abuse of discretion. *Frazier* at 251.

**{¶22}** The state contends that the *Frazier/Maxwell* competency review of a child witness does not need to include questions about the crime at issue, and cites a long list of cases supporting this interpretation. It is clear to us that factors one and two of the *Frazier/Maxwell* test cited above direct the trial judge to question the child about the impressions and facts that will be part of the testimony. The interpretation of these factors by appellate courts have led many to conclude that they only require the trial judge to determine if the child: has an understanding of truth and lies; can answer general questions about his or her life; and can adequately discuss and relay back information presented in the hearing.

**{¶23}** For example, the Sixth District case of *State v. Jones* held that:

Many Ohio courts have affirmed a trial court's finding of competency in cases where the competency hearing did not include questions about the crime at issue. Often, a competency hearing contains only general questions about the child's everyday life. Although it arguably may have been helpful if the trial court in this case had questioned the children as to

some of the events of the indictment, we find that doing so was not necessary to the trial court's competency evaluation.

*State v. Jones*, 6th Dist. Lucas No. L-09-1262, 2011-Ohio-2173, ¶ 17.

**{¶24}** Similarly, *State v. Brooks*, 2d Dist. Montgomery No. 18502, 2001 WL 1295285 (Oct. 26, 2001), held that "a general inquiry is sufficient for a trial court to determine if a child can perceive, recollect, and truthfully relate events." *Brooks* further held that "[a]lthough it would have been helpful if the trial judge would have questioned the minor regarding the rape and the circumstances surrounding the rape, it was not necessary in the trial court's competency determination." *Id.* at *3.

**{¶25}** We cited *Brooks* in *State v. Anderson*, 7th Dist. No. 01-CA-214, 154 Ohio App.3d 789, 2003-Ohio-5439, 798 N.E.2d 1155, when we found that: "In the present case, the court determined Brea's competence by asking her questions that demonstrated that she could recount and relate past events and that she knew she should tell the truth in court. Therefore, we cannot say that the court abused its discretion in failing to question Brea about the shootings." *Id.* at ¶ 66.

**{¶26}** The state is therefore correct in explaining the proper standard for reviewing voir dire questioning of a child witness who is under ten years old, with the caveat that it was at least the intent of *Frazier/Maxwell* that voir dire should include questioning about the crime or the content of the proposed testimony. This appeal underscores why questioning the child about the crime itself can sometimes be necessary in determining competency.

**{¶27}** The parties agree that J.M. was not asked any questions in voir dire about the crime. Appellant is correct that J.M. was not asked questions testing his ability to

receive accurate impressions, whether those are immediate impressions or the child's impressions at the time of murder. We also must keep in mind that the voir dire occurred on August 2, 2021, while the crime occurred on October 22, 2019. At the voir dire, J.M. was asked about his family (but not about Appellant's involvement in the family), his daycare, his meals, Christmas presents, his play time, and about telling the truth. J.M. was also able to tell when the trial judge would say something incorrect (on purpose). The judge did this to verify that J.M. knew whether the judge was telling the truth or not.

{¶28} At trial J.M. was asked similar types of questions. The critical piece of testimony at trial, though, was the following:

Q.     Okay. The last time that you saw your mom, what happened?

A.     The cops took me away from and she was away.

Q.     The cops took you away?

A.     Yeah, before I could see.

Q.     Did you see your dad do something to your mom?

A.     No because the cops took me away.

Q.     All right. The cops took you away.

A.     Yeah.

Q.     Before that happened --

A.    Yeah.

Q.    -- did you see your dad and your mom?

A.    Yes.

Q.    What happened?

A.    My dad shot my mom, and cops took me away, and I couldn't see again.

Q.    Your dad shot your mom?

A.    Yes.

Q.    And the cops took you away so you wouldn't see it again?

A.    Yes.

Q.    After your dad shot your mom, did you talk to your dad at all?

A.    No because I wasn't allowed.

Q.    You weren't allowed.  Okay.  What did you do after your dad shot mom?

A.    The cops told me to come outside, so I did, and got in the police car and they took me to my grandma's.

Q.    Did you see your mom on the ground?

Case No. 21 CO 0035

A.     Yes.

Q.     What did she look like?

A.     Laying on the ground and blood was everywhere.

(Tr., pp. 881-883.)

{¶29} This is all the information that was revealed on direct examination.  On cross-examination, J.M. also testified that after his mom came home from work his dad and mom had an argument inside the house.  (Tr., p. 887.)  He testified that he was upstairs watching television when they argued.  He testified that he and siblings heard a shot, and after that they ran outside.  (Tr., p. 889.)

{¶30} Other parts of the record indicate that J.M. did not come forward with this story immediately.  A few months after the murder J.M. told his uncle that his daddy shot his mommy.  This was reported to authorities.  J.M. was not interviewed by social worker Courtney Wilson of Akron Children's Hospital until July 15, 2020, nine months after the murder.  (Tr., p. 894.)  J.M. told Ms. Wilson that "his dad shot her."  (Tr., p. 899.)  J.M. told her that there was a great deal of blood, that his mom and dad were arguing outside before his dad entered the home, and that he saw a gun.  (Tr., p. 899.)  Ms. Wilson stated that there was nothing else of importance from that interview.  At trial, J.M. did not remember having this interview. (Tr., p. 885.)  Nothing in his trial testimony indicates that he saw a gun, and at trial he testified that the argument happened inside.

{¶31} A careful reading of the transcripts reveals that J.M. did not testify he saw the shooting, but only that "my dad shot my mom."  This is exactly how Ms. Wilson described it:  that J.M. said "that his dad shot her."  He could have been told this by any

number of people rather than having witnessed it himself. The statement "my dad shot my mom" is actually a conclusion and not testimony regarding witnessing a crime. He also testified that he was upstairs watching television, heard a shot, and immediately ran outside. There is no means of testing J.M.'s trial testimony against the answers in the voir dire because he was not asked what he remembered about the crime during voir dire. Obviously, a child testifying about his mother's murder is an important piece of evidence, and yet, J.M. failed to actually state that he saw the murder and seemed to contradict himself in his testimony.

{¶32} Based on the specific facts of this case, we must conclude that the trial court committed error in the voir dire of this child. However, the next important question is whether the error affected the outcome of the trial. We conclude it did not. The volume of evidence against Appellant, even without the child's testimony, is overwhelming. Multiple witnesses and security camera videos placed Appellant and his car at the scene of the crime at the time of the shooting. Appellant's DNA matched DNA evidence on the gun holster, the footprint on the front door matched Appellant's. The murder weapon that was recovered appeared in photos on Appellant's Facebook page, threats were made on Facebook, and there was prior evidence of Appellant's attacks on the victim, including choking her with a cord, punching her in the face, and beating her until she was unconscious. The record contains Appellant's prior threats to kill the victim. Appellant made statements to multiple witnesses that he was at the victim's home the night of the crime. There is evidence that Citasia Tisdale and Appellant tried to cover up the crime by making it appear the shooting occurred later in the morning, after Appellant had departed from the scene. The jurors, if they were paying attention to J.M.'s testimony,

may have noticed the obvious fact that he did not say he saw the murder take place. Regardless, there is an overwhelming amount of evidence in this case on which to base a conviction. We conclude that the error in allowing J.M.'s testimony did not affect the outcome of this case. As the error was not prejudicial, Appellant's first assignment of error is overruled.

ASSIGNMENT OF ERROR NO. 2

THE TRIAL COURT FAILED TO PROPERLY ADMONISH THE JURY DURING BREAKS IN THE TRIAL.

{¶33} R.C. 2945.34 states: "If the jurors are permitted to separate during a trial, they shall be admonished by the court not to converse with, nor permit themselves to be addressed by any person, nor to listen to any conversation on the subject of the trial, nor form or express any opinion thereon, until the case is finally submitted to them." Appellant argues that the trial court gave a single admonition at the beginning of the five-day trial, but the next eleven times that the court should have admonished the jury, the judge merely reminded the jurors of the initial admonishment. Appellant has no quarrels with the original admonition. He only objects to the cursory nature of all the subsequent admonitions. Appellee does not disagree with this assessment of the record, but concludes that the initial admonition was sufficient. The initial admonishment covers five pages of the transcript and is very extensive.

{¶34} Appellee notes that an error in admonishing the jury is not reversible error unless it is also shown that the jury was in fact guilty of misconduct. *State v. Helm*, 1st Dist. Hamilton No. C-150242, 2016-Ohio-500, 56 N.E.3d 436, ¶ 25. The

mere violation of R.C. 2945.34 does not, in and of itself, constitute reversible error: "R.C. 2945.34 does not prescribe reversal if the trial court fails to comply[.]" *State v. Rose*, 2nd Dist. Montgomery No. 17431, 1999 WL 957715, *2. Appellant does not disagree, but he argues that this prejudicial error requirement should be waived in this appeal.

{¶35} Appellee also points out that Appellant did not object to the abbreviated jury admonitions, and that failure to object waives all error except for plain error. *State v. McCray*, 5th Dist. Stark No. 2013CA00133, 2014-Ohio-2289, ¶ 42, citing *Warner v. State*, 104 Ohio St. 38, 135 N.E. 249 (1922). There are no objections noted in the record.

{¶36} Based on the very clear admonition given by the trial court at the beginning of trial, the lack of any evidence of juror misconduct, and the failure to preserve this objection, Appellant's second assignment of error is overruled.

ASSIGNMENT OF ERROR NO. 3

DEFENDANT RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL.

{¶37} Appellant argues that his counsel engaged in ineffective assistance of counsel, citing six examples.

{¶38} The test for an ineffective assistance of counsel claim is two-part: whether trial counsel's performance was deficient and whether the deficiency resulted in prejudice to the defendant. *State v. White*, 7th Dist. Jefferson No. 13 JE 33, 2014-Ohio-4153, ¶ 18, citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Williams*, 99 Ohio St.3d 493, 2003-Ohio-4396, 794 N.E.2d 27, ¶ 107.

**{¶39}** In order to prove prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Lyons*, 7th Dist. Belmont No. 14 BE 28, 2015-Ohio-3325, ¶ 11, citing *Strickland* at 694; see also *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus. The appellant must affirmatively prove the alleged prejudice occurred. *Id.* at 693. The appellant also must demonstrate more than vague speculations of prejudice to prove prejudice. *State v. Otte*, 74 Ohio St.3d 555, 566, 660 N.E.2d 711 (1996).

**{¶40}** If one prong of the *Strickland* test is not met, an appellate court need not address the remaining prong. *Id.* at 697. The appellant bears the burden of proof on the issue of counsel's effectiveness. A licensed attorney is presumed competent. *State v. Calhoun*, 86 Ohio St.3d 279, 289, 714 N.E.2d 905 (1999).

**{¶41}** Courts are very deferential to the tactical choices that attorneys make at trial and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Bradley* at 142, citing *Strickland* at 689. Counsel's tactical choices, even those having negative consequences, normally do not constitute ineffective assistance. *State v. Carpenter*, 116 Ohio App.3d 615, 626, 688 N.E.2d 1090 (2nd Dist.1996).

**{¶42}** Appellant's first example of ineffectiveness is that his counsel failed to object to the lack of any black jurors. Appellant is black.

**{¶43}** The constitutional guarantee to a jury trial "contemplates a jury drawn from a fair cross-section of the community." *Taylor v. Louisiana*, 419 U.S. 522, 527, 95 S.Ct.

692, 42 L.Ed.2d 690 (1975). This is not a specific requirement that the jury "must mirror the community and reflect the various distinctive groups in the population." *Id.* at 538. " 'Defendants are not entitled to a jury of any particular composition, but the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof.' " *State v. Johnson*, 88 Ohio St.3d at 117, 723 N.E.2d 1054, quoting *Taylor* at 538.

> In order to establish a violation of the fair representative cross-section of the community requirement for a petit jury array under the Sixth and Fourteenth Amendments to the United States Constitution, a defendant must prove: (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that the representation is due to systematic exclusion of the group in the jury-selection process.

*State v. Fulton*, 57 Ohio St.3d 120, 566 N.E.2d 1195, (1991), paragraph two of the syllabus.

{¶44} Appellant has presented no evidence of any attempt to systematically exclude persons of color from the jury. His argument is based solely on the fact that there were no black persons on his jury. However, underrepresentation or lack of representation of a group on a single jury does not constitute systematic exclusion. *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 113; *State v.*

*McNeill*, 83 Ohio St.3d 438, 444, 700 N.E.2d 596 (1988). Appellant's argument, therefore, has no merit.

**{¶45}** Appellant raises, in very cursory fashion, five other alleged errors made by counsel. First, counsel at one point called the victim by the wrong name. Second, the court mentioned that a matter regarding the presentation of exhibits to a particular witness would be handled at a break, but the matter was not discussed at the break, and counsel did not object. Third, counsel did not object having the audio recording played in front of the jury. Fourth, a witness was permitted to testify "regarding other bad acts" without objection. (Appellant's Brf., p. 11.) Fifth, a witness was allegedly permitted to give "hearsay testimony" without objection. (Appellant's Brf., p. 11.)

**{¶46}** Appellant does not explain how any of these alleged errors are actually errors as a matter of law, does not explain how any of them may have prejudiced him at trial, fails to cite a single statute, case or specific rule that is violated, and gives no further explanation as to how these allegations constitute ineffective assistance of counsel.

**{¶47}** It is not the state's responsibility to make Appellant's arguments for him, only to then refute them as part of its own argument. Without any citation of law or actual argument made in support of Appellant's allegations, all of his trial counsel's actions can be attributed either to trial tactics, or may be deemed harmless errors, either of which defeats a claim of ineffective assistance of counsel. Crim.R. 52 allows for harmless errors to be disregarded, whether at trial or on appeal. "[T]he harmless-error rule, was created in essence to forgive technical mistakes." *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 24.

**{¶48}** For all these reasons, Appellant's third assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 4

THE TRIAL COURT ERRED IN ALLOWING VIDEO SURVEILLANCE AND FACEBOOK POSTS INTO EVIDENCE.

**{¶49}** Appellant argues that seven surveillance video recordings and a variety of postings on the social media platform Facebook should not have been entered into evidence. Appellant contends that none of these items were admitted with proper authentication. Appellant's contentions are incorrect.

**{¶50}** Evid.R. 901 requires evidence to be properly authenticated before it is deemed admissible. "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." "This low threshold standard does not require conclusive proof of authenticity, but only sufficient foundational evidence for the trier of fact to conclude that the document is what its proponent claims it to be." *State v. Easter*, 75 Ohio App.3d 22, 25, 598 N.E.2d 845 (4th Dist.1991). "[T]here is nothing to prevent parties from voluntarily stipulating to the admissibility of evidence otherwise requiring authentication." *Dungan v. Poynter*, 12th Dist. Clinton No. CA96-09-016, 1997 WL 423348, *1, citing Ohio Evid. R. 901, staff notes.

**{¶51}** Starting with the Facebook posts, the parties stipulated to the authenticity of all of them. (Tr., p. 828.) Parties are permitted to stipulate to authenticity. Therefore, there is no error in failing to provide further evidence of authenticity.

Case No. 21 CO 0035

**{¶52}** Regarding the videos, the parties agree that video evidence is authenticated in the same manner as photographic evidence. One method of authenticating photographic evidence is under the "pictorial testimony" theory, in which the photograph is merely illustrative of a witness' testimony and must have a sponsoring witness who must testify "that it is a fair and accurate representation of the subject matter, based on that witness' personal observation." *State v. Green*, 7th Dist. Mahoning No. 12 MA 226, 2014-Ohio-648, ¶ 12, citing *Midland Steel Prods. Co. v. U.A.W. Local 486*, 61 Ohio St.3d 121, 129-130, 573 N.E.2d 98 (1991).

**{¶53}** Another way to authenticate photographic or video evidence is via the "silent witness" theory: "Under the silent witness theory, photographic evidence may be admitted upon a sufficient showing of the reliability of the process or system that produced the evidence." *Midland Steel Prods. Co.* at 130. Using this method of authentication, "the photographic evidence is a 'silent witness' which speaks for itself, and is substantive evidence of what it portrays independent of a sponsoring witness." *Id.*

**{¶54}** "Silent witness" authentication normally requires proof of the reliability of the video recording system, proof of the custody of the video recording, a showing that the evidence has not been altered, and that the video being shown is from the camera system being described. *State v. Green*, 7th Dist. Mahoning No. 12 MA 226, 2014-Ohio-648, ¶ 13. "It is not necessary that the individual authenticating the footage must have actually witnessed the events as they occurred, merely that he or she is able to verify that the material is what it purports to be: in this instance, the complete surveillance footage of the incident." *Id.* at ¶ 14. Reliability can be proven by the video equipment installer, a user

of the equipment, or by a law enforcement officer who investigated the matter. *State v. Vermillion*, 4th Dist. Athens No. 15CA17, 2016-Ohio-1295, ¶ 17-20.

**{¶55}** Authentication is an evidentiary matter and is reviewed under an abuse of discretion standard. *Green* at ¶ 11. "We have defined an abuse of discretion as conduct that is unreasonable, arbitrary or unconscionable." *State v. Beasley,* 152 Ohio St.3d 470, 2018-Ohio-16, 97 N.E.3d 474, ¶ 12.

**{¶56}** Five of the videos are of the street outside of the victim's apartment and show vehicle and foot traffic at the time of crime. They are used to track Appellant inside his vehicle and on foot, and to establish the movements of other persons at or near the time of the crime. One of the videos also includes the sound of a gun being fired at 2:21 a.m. There are two exhibits from Nick's Pizza because Lieutenant Marsha Eisenhart left out one video clip from the first exhibit she created for trial, so she created a second one.

**{¶57}** The video from Wellsville School District was introduced to corroborate the testimony of Sadie Allen. The video from New Dimension Bar in East Liverpool was introduced to corroborate the testimony of Michelle Byers.

**{¶58}** Neither party cites to any objections made by Appellant to the authentication of the videos when they were entered into evidence. Appellant's counsel did object to the accuracy of the time-stamp on the video provided by Cindy Mick, which could be interpreted as an objection to authenticity. (Tr., pp. 1019-1021.) Appellant's counsel raised other objections to the videos, but none of the objections are based on authentication. Therefore, the challenge to the authentication of the video exhibits is reviewed for plain error, except for the Mick video, which is reviewed for abuse of discretion.

**{¶59}** Pursuant to Crim.R. 52(B), "plain errors" that affect a defendant's substantial rights "may be noticed although they were not brought to the attention of the court." A court will only take "[n]otice of plain error * * * with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

**{¶60}** Wellsville Police Department Lieutenant Eisenhart authenticated the seven video recordings being challenged by Appellant. Further, the state provided evidence from the users of each of video, who testified about the footage provided to Eisenhart. These witnesses all described how the surveillance systems worked, how the digital files were stored, and how the files were to be delivered to the police. These facts alone satisfy the authentication standards discussed above for video evidence under a plain error standard.

**{¶61}** Appellant challenges the video from Cindy Mick because she did not testify about the actual video clip that would be used at trial and because it is not clear how the Wellsville Police Department obtained the video. This video is from a backyard video camera. Cindy Mick testified about the type of camera, how it was installed in her yard, how it recorded images, that it was on a continuous record setting, and that it included sound. The file and folder structure of the SD card (a digital storage device for holding electronic data) were examined at trial to show that there was a folder for every hour and minute of recording. Mick testified that the video clips showed her backyard.

**{¶62}** Mick was not asked to view the specific clip that was relevant to trial. This is not a requirement under *Midland Steel Prods. Co.*, this Court's *Green* case, or any case setting forth the "silent witness" method of authenticating video evidence. The "silent

witness" method authenticates the process for recording the videos, not the detailed content of the videos. Mick testified that she put the SD data card in a baggy, handed it to the police, and identified the exhibit at trial. There was no abuse of discretion in allowing this video into evidence.

**{¶63}** Appellant challenges the video from My Bar because the entire DVR recording machine was given to the police instead of a copy of the recording, but the recording used at trial was not directly on the DVR machine, but a copy of the video on a flash drive. It is not clear why Appellant believes this was a legal error. Lieutenant Eisenhart testified that the DVR machine was sent to the state BCI lab, and a copy of the video was retrieved and put on a flash drive. (Tr., p. 1024.) Appellant did not object to this authentication at trial, and the chain of custody was discussed at trial. When Roy Larkins, the owner of My Bar, was on the stand, the state offered to show him all the video that was on the flash drive, but Appellant's counsel replied that he did not want to see all of the video content. (Tr., p. 320.)

**{¶64}** Appellant objects to the use of the video from New Dimension Bar because witness Mark Walton, the owner of the bar, was not asked to authenticate the actual video clip used at trial. As mentioned earlier, this is not required when authenticating a video clip under the "silent witness" theory.

**{¶65}** Appellant objects to the use of the video clips from Nick's Pizza because the first clip did not show the date and time, but the second clip did. Our examination of the video clips reveal time stamps on both. The testimony of Lieutenant Eisenhart at trial was that the two exhibits, 57 (a flash drive) and 205 (a disc), were identical except that 205 had one additional clip on it that was inadvertently left off of exhibit 57. The new

copy, exhibit 205, was produced so that all the clips needed for trial were on one disc. The record does not support that any error occurred.

**{¶66}** Appellant takes issue with the video from the Fraternal Order of Eagles because witness William Collins, a trustee for the Eagles, did not authenticate the entire video clip. Again, this is not required under *Midland Steel Prods. Co.*, the *Green* case, or any case setting forth the "silent witness" theory of authentication.

**{¶67}** Appellant challenges the video from Kwik King because witness Elaine Austin, who was a clerk and manager at the store, did not know how the video was turned over to police and because she only authenticated part of the video. She also did not know whether the data from all cameras was stored on the same digital recorder. Austin testified about the camera system, where the cameras were located, and that she was familiar with their use through the prior investigation of a robbery. She identified the video for one of the cameras and explained what the footage was from that camera. Lieutenant Eisenhart testified that she went into Kwik King, asked for a copy of the video, and someone copied it for her. (Tr., p. 1029.) Appellant did object to the introduction of this video.

**{¶68}** There is a very low bar for authenticating evidence, particularly video evidence under the "silent witness" theory. The purpose of authentication under this theory is to show the reliability of the process that produced the evidence, and the video will then speak for itself that it is what it purports to be. *Midland Steel Prods. Co.* at 129-130. There was testimony about how the Kwik King surveillance system worked and that the cameras properly and accurately recorded images from the store. As vague as some

of Lieutenant Eisenhart's testimony was about the video, it did show how the video was obtained.

**{¶69}** Appellant does not appear to be challenging the actual content of the Kwik King videos, but simply believes that the authentication is not sufficient. Even if the Kwik King evidence had been excluded from trial, this would not have changed the result of the trial. The Kwik King video was only one of many pieces of evidence showing that Appellant was at or near Destiny Moody's apartment at the time of the murder. Appellant has not demonstrated any prejudice even if there was insufficient authentication of this video, and there is no basis for sustaining this assignment of error with respect to the Kwik King video.

**{¶70}** Appellant challenges the use of the video from Wellsville High School football stadium. Witness Bill Ricciardulli, the tech coordinator for Wellsville schools, did not know how the police obtained the video and there is no further evidence in the record as to how it became part of the evidence. Ricciardulli otherwise testified as to the design, installation, and the manner in which the system worked. No objections appear in the record as to this evidence. He testified that the part of the video he saw at trial was accurate and true. Without some type of challenge to the content of the video, and with no objection raised, no plain error can be found as to the inclusion of this evidence at trial.

**{¶71}** Appellant's fourth assignment of error is overruled.

<u>ASSIGNMENT OF ERROR NO. 5</u>

DEFENDANT WAS DENIED A FAIR TRIAL DUE TO THE CUMULATIVE ERRORS IN THE ALLOWANCE OF INADMISSIBLE TESTIMONY, THE ACTIONS OF COUNSEL AND THE COURT.

**{¶72}** Appellant argues that there was cumulative error in this case requiring reversal. Under the doctrine of cumulative error, a reviewing court will reverse a conviction when the cumulative effect of errors deprives a defendant of a fair trial even though each of the instances of error does not individually constitute cause for reversal. *State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 140, citing *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, at ¶ 223. Harmless errors do not become reversible error simply because of the sheer number. *State v. Hill*, 75 Ohio St.3d 195, 212, 661 N.E.2d 1068 (1996). The defendant must make an affirmative showing that multiple errors deprived him of a fair trial. *State v. Hohvart*, 7th Dist. Mahoning No. 06 MA 43, 2007-Ohio-5349, ¶ 37.

**{¶73}** The only error Appellant has demonstrated was the deficient voir dire of the child witness J.M., and since Appellant was not prejudiced by this error it does not rise to the level of reversible error. With no other demonstrated errors, it is apparent there is no cumulative error. Appellant's fifth assignment of error is overruled.

## Conclusion

**{¶74}** Appellant has raised five assignments of error on appeal. The first was sustained, as the trial court should have conducted a more thorough voir dire of the child witness J.M. Nevertheless, this error did not affect the outcome of trial due to the overwhelming evidence of guilt offered in this case. Thus, it was not reversible error. Appellant also argued that the court failed to properly admonish the jury to not talk about the case, but the record contains an extensive admonishment at the beginning of trial and a reminder of that admonishment many times throughout the trial. Appellant argued that trial counsel was ineffective, but he could not demonstrate either error or prejudice from

counsel's actions. Appellant argued that Facebook posts were not properly authenticated, but the parties stipulated to authenticity. Appellant argued that seven videos should not have been admitted as evidence due to lack of authentication, but the record shows they were properly authenticated. Finally, he argued cumulative error, but there must be multiple errors on the record for cumulative error to apply. All five of Appellant's assignments of error are overruled and the judgment of the trial court is affirmed in full.

Robb, J., concurs.

Hanni, J., concurs.

[Cite as *State v. Haywood*, 2023-Ohio-1121.]

---

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Columbiana County, Ohio, is affirmed.  Costs waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**