[Cite as *State v. Williams*, 2026-Ohio-2061.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
BELMONT COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

MALCOLM A. WILLIAMS,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
Case No. 25 BE 0044

---

Criminal Appeal from the
Court of Common Pleas of Belmont County, Ohio
Case No. 24 CR 76

**BEFORE:**
Mark A. Hanni, Cheryl L. Waite, Carol Ann Robb, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. J. Kevin Flanagan*, Belmont County Prosecutor, and *Atty. Jacob A. Manning*, Assistant Prosecuting Attorney, for Plaintiff-Appellee and

*Atty. Edward A. Czopur*, for Defendant-Appellant.

Dated: June 2, 2026

**HANNI, J.**

**{¶1}** Defendant-Appellant, Malcolm A. Williams, appeals from a Belmont County Common Pleas Court judgment convicting him of attempted murder with a firearm specification. He was sentenced to a total of 14 years in prison.

**{¶2}** Appellant argues on appeal that the trial court committed plain error by admitting hearsay when it allowed the jury to view a video-taped statement made by the victim when the victim testified at trial. He asserts the trial court also improperly admitted videos prepared by Old Dominion Freight Trucking Company (Old Dominion) when the witness who authenticated those exhibits at trial did not create them. Appellant further asserts the trial court erroneously admitted Electronic Log Data (ELD) and an ELD report without proper authentication. He additionally contends the court erroneously admitted the testimony of a Bureau of Criminal Investigations (BCI) agent who improperly testified about the testing of evidence conducted by another BCI agent.

**{¶3}** Appellant also argues he was denied a fair trial when a detective was permitted to improperly bolster the credibility of the victim by vouching for him. He further asserts his trial counsel was ineffective for repeatedly failing to object to the admission of the above evidence. Finally, Appellant alleges cumulative error occurred, which deprived him of due process and a fair trial.

**{¶4}** For the following reasons, we affirm Appellant's conviction and sentence.

## FACTS OF THE CASE

**{¶5}** On January 30, 2024, M.B. (victim), a commercial truck driver, pulled his truck over on the berm of Route 470 in Belmont County due to engine problems. Another truck driver pulled over, approached the victim, and shot him in the face. After an investigation, Ohio State Highway Patrol (OSHP) troopers secured an arrest warrant and Appellant was arrested in Michigan. A search incident to his arrest revealed a Glock .40 caliber in his left pocket. A shell casing found on the roadway where the victim was shot matched Appellant's gun.

**{¶6}** At trial, the victim testified he was a commercial truck driver and on January 30, 2024, he was driving his truck into Ohio from West Virginia and began experiencing engine problems on Route 470 in Belmont County. (Trial Tr. 294-298). He called his

boss, who had him call Matt Mohr, a mechanic who performed work for the company. (Trial Tr. 298). The victim pulled his truck over to the berm and exited to inspect the truck for problems. (Trial Tr. 298-299). He and Mr. Mohr discussed possible motor issues and the victim sent a picture of the truck's engine to Mr. Mohr at 10:18 p.m. (Trial Tr. 310-311).

{¶7} The victim testified that while inspecting his truck, he noticed a semi-truck slowing down on the road. (Trial Tr. 300). As he closed the hood, he observed the truck pull over to the berm in front of him. (Trial Tr. 300). He told Mr. Mohr an over-the-road trucker was walking toward him. (Trial Tr. 300). Mr. Mohr told the victim to ask the trucker for a fuel filter. (Trial Tr. 300). The victim testified the trucker asked if he needed help and he responded he needed a fuel filter. (Trial Tr. 301).

{¶8} The victim recalled then witnessing a flash 10 feet away from him. (Trial Tr. 306). He remembered the trucker pulling a gun from his left pocket and shooting him in the face. (Trial Tr. 306-307). The bullet penetrated the victim's right cheek, shattered his jaw bone, and exited the back of his neck. (Trial Tr. 307-309). He sent a cell phone picture of his face to Mr. Mohr at 10:23 p.m. (Trial Tr. 311, 325). The victim testified he underwent surgery and doctors inserted permanent plates into the right side of his face. (Trial Tr. 308-309, 351-352).

{¶9} The State played part of Exhibit 14A during the victim's testimony. (Trial Tr. 303-305). The Exhibit is a video produced by Old Dominion that captured a truck in the vicinity of the victim's truck on the berm on January 30, 2024. (Trial Tr. 303-305, 373-374). Part of State's Exhibit 29 was also played during the victim's testimony. (Trial Tr. 311-312). This is the victim's recorded February 2, 2024 interview with OSHP Trooper Trenas Weaver. (Trial Tr. 311-312). The victim testified at trial that he told Trooper Weaver he remembered a bluish-green, three-letter logo on the end or back of the shooter's truck. (Trial Tr. 312-313).

{¶10} Matthew Mohr also testified for the State. He explained the victim called him on January 30, 2024 about engine problems and sent him a picture of the truck's motor at 10:18 p.m. (Trial Tr. 245-246). Mr. Mohr advised the issue was most likely a fuel filter and told the victim to check inside his truck for an extra filter. (Trial Tr. 245).

Case No. 25 BE 0044

**{¶11}** Mr. Mohr recalled the victim stating a truck had pulled over in front of his truck on the berm as he was closing the hood. (Trial Tr. 246). Mr. Mohr testified the victim said a man was walking back toward him and Mr. Mohr told the victim to ask if he had an extra filter. (Trial Tr. 246). Mr. Mohr overheard the victim tell the man he was good and he thought it was just a fuel filter. (Trial Tr. 247). Mr. Mohr testified the victim's phone then went silent and Mr. Mohr said hello a couple of times, but received no response. (Trial Tr. 247).

**{¶12}** Mr. Mohr recalled the victim telling him he had just been shot, but Mr. Mohr did not understand him. (Trial Tr. 247). Mr. Mohr testified his phone alerted and the victim had sent a picture of his face. (Trial Tr. 247). The time on his phone was 10:23 p.m. (Trial Tr. 248).

**{¶13}** Mr. Mohr testified he grabbed another phone and called the victim's boss as his boss could call 911 and notify them of the victim's location because of GPS installed in the truck. (Trial Tr. 248). Mr. Mohr advised the boss the victim had been shot. (Trial Tr. 248). He remained on the phone with the victim to keep him calm. (Trial Tr. 248). When Mr. Mohr asked the victim to describe the shooter, the victim described a black man who wore a mask. (Trial Tr. 249). Mr. Mohr thereafter drove to the location and met with the OSHP. (Trial Tr. 249-250). The victim had been taken to the hospital by that time. (Trial Tr. 250).

**{¶14}** Sergeant Warren Rawlings of the OSHP testified he arrived at the scene and his body camera video showed the victim sitting on the ground with a hole in the front of his face and in the back of his neck. (Trial Tr. 257-258). Sergeant Rawlings indicated the victim stated the shooter was a "colored" man wearing "all black," approximately 5'10" to 6 feet tall, and 200 pounds. (Trial Tr. 264, 273-274). Portions of the body camera footage were played for the jury. (Trial Tr. 264-270). Sergeant Rawlings testified he panned the berm area with a flashlight and preserved a spent shell casing he found lying in the right lane of Route 470. (Trial Tr. 267).

**{¶15}** Dr. Del Zotto testified he treated the victim in the emergency room at West Virginia University Hospital on January 30, 2024. (Trial Tr. 342). He described the victim's injuries as serious and explained the victim's eventual transfer to Ruby Hospital in Morgantown, West Virginia to undergo surgeries. (Trial Tr. 343-353).

**{¶16}** OSHP Trooper Keith Roe testified he was part of the investigation on January 30, 2024. (Trial Tr. 511). He began reviewing ODOT cameras positioned at the state line entering into Ohio on Route 470, shortly after Route 470 merges with Interstate 70. (Trial Tr. 511-512). He narrowed down the relevant time period of the shooting from 10:18 p.m. to 10:23 p.m. based on the photographs texted from the victim to Matt Mohr. (Trial Tr. 512-513).

**{¶17}** OSHP Trooper Roe explained that based on observations from the ODOT cameras, camera footage was requested from trucking companies whose trucks passed by the scene during the relevant time period. (Trial Tr. 513-514). He testified that FedEx, Old Dominion, and Super Ego trucks were identified. (Trial Tr. 514-516).

**{¶18}** John Hughes, regional safety manager for the Great Lakes region of Old Dominion, also testified. (Trial Tr. 370). He described the camera systems installed in Old Dominion trucks and confirmed that the OSHP requested video from those trucks traveling in the relevant area on January 30, 2024. (Trial Tr. 372-374). He testified he reviewed and provided the footage. (Trial Tr. 376). The videos were introduced as State's Exhibit 14 and 14A. (Trial Tr. 377).

**{¶19}** Mr. Hughes explained he obtained the relevant footage because all commercial trucks now have tracking systems installed which allow employers to pinpoint a specific area and observe the trucks that drive through that area at specific times. (Trial Tr. 374). He noted that employers then obtain the unit number of the truck and access the camera from the corporate office where the videos are maintained. (Trial Tr. 375). He testified that Old Dominion videos are compiled by the company's "camera team" in the North Carolina corporate office. (Trial Tr. 381-382). The trial court overruled defense counsel's objection to the introduction of these exhibits because Mr. Hughes did not compile them. (Trial Tr. 379-381).

**{¶20}** On cross-examination, Mr. Hughes acknowledged he did not compile the video. (Trial Tr. 386). The State played portions of State's Exhibits 14 and 14A, which showed footage from an Old Dominion truck driving by the location where the victim's truck was pulled over on the berm. (Trial Tr. 387). Mr. Hughes agreed the video showed two trucks pulled over on the side of the road, but he could not see anyone outside. (Trial Tr. 388-389). He observed the first truck had its hazard lights on, but not its headlights,

and the second truck had on its headlights. (Trial Tr. 388-389). Mr. Hughes also testified he knew of no report of anyone hearing a shot or seeing anything during the relevant time period. (Trial Tr. 389-390).

{¶21} Nikola Jovanovic testified he is a shop manager in Elmhurst, Illinois for a trucking company affiliated with Super Ego. (Trial Tr. 393-394). As part of his duties, he installs ELDs into the trucks to track driving times and idle/stop times. (Trial Tr. 395). He testified he was asked to provide idling information from the ELDs in Super Ego fleets for the evening of January 30, 2024. (Trial Tr. 398).

{¶22} Mr. Jovanovic testified he obtains this information by calling the manager of the company and asking him to send the ELD report. (Trial Tr. 398). The report contains all idling information from all Super Ego trucks on that evening. (Trial Tr. 398-399). They are arranged by the Vehicle Identification Numbers (VIN) of each truck. (Trial Tr. 398).

{¶23} He indicated he sent the ELD idling information report to the OSHP. (Trial Tr. 403). The State reviewed the report with Mr. Jovanovic, which was presented as Exhibit 16. (Trial Tr. 408-414). He testified that truck number 2438 idled from 10:19:02 p.m. until 10:21:23 p.m., four miles west-southwest from Wheeling, West Virginia. (Trial Tr. 413-414). He further testified that truck number 2438 idled again from 11:10:56 p.m. until 11:15:28 p.m., about three miles south southeast from Cambridge, Ohio. (Trial Tr. 414).

{¶24} The State presented Exhibit 16A, which was a report for all entries listed from Exhibit 16 for truck number 2438 on January 30, 2024. (Trial Tr. 415). Mr. Jovanovic testified the truck numbers correspond with the last four digits of the trucks' VINs. (Trial Tr. 417). He also confirmed truck number 2438 listed the driver as Appellant. (Trial Tr. 443-444).

{¶25} Michael Lowery also testified for the State. He worked at A. Dui Pyle in Greencastle, Pennsylvania, about 200 miles from Belmont County. (Trial Tr. 448, 450). He indicated that video camera footage from his employer showed that on January 30, 2024 at 11:58 a.m., Appellant walked into the company warehouse. (Trial Tr. 463).

{¶26} James Smithheart also testified. He is a security specialist at Pilot Company. (Trial Tr. 469). He testified that the OSHP requested video camera footage from a Pilot store in Cambridge, Ohio from January 30, 2024 through January 31, 2024.

(Trial Tr. 469-470). He indicated the footage showed that at approximately 5:54 a.m. on January 31, 2024, truck number 2438 bought diesel fuel from a Pilot store in Cambridge, Ohio. (Trial Tr. 476-477).

**{¶27}** Michigan Police Officer Daniel Dischler testified that he conducted an inspection of truck number 2438 on January 2, 2024. (Trial Tr. 481). He completed a report which identified, among other things, the carrier information and the driver's information. (Trial Tr. 483). He read the VIN out loud and noted the last four digits as 2438. (Trial Tr. 484). He also noted that the driver's information contained Appellant's name. (Trial Tr. 483).

**{¶28}** Michigan Police Officer Daniel Lubelan aided in executing the arrest warrant for Appellant. He testified the fugitive team of the police department received information that a semi-truck driver was coming through and the driver was wanted for felonious assault. (Trial Tr. 605). He explained the team set up surveillance to intercept the truck and he and three others stopped Appellant's truck to effectuate the arrest. (Trial Tr. 607-609). He was shown State's Exhibit 21, which was body camera video from another team member. (Trial Tr. 608-609). Officer Lubelan also confirmed pictures the prosecution showed him were of a jacket with a hood and a hat, which were items Appellant was wearing when he was arrested. (Trial Tr. 609-610). Officer Lubelan also testified he pulled the weapon out of Appellant's pocket upon searching him incident to arrest. (Trial Tr. 612). He confirmed that the Glock pistol he was shown was the same weapon recovered from Appellant. (Trial Tr. 616).

**{¶29}** Special Agent Matthew Voytek of the Bureau of Alcohol, Tobacco, Firearms and Explosives also testified. (Trial Tr. 493). He stated he received a request for a firearms trace summary on the firearm recovered from Appellant upon his arrest. (Trial Tr. 499). The trace of the gun showed it was a Glock .40 caliber and its purchaser was a third-party from a pawn shop in Alabama. (Trial Tr. 499-502).

**{¶30}** Andrew McClelland, a forensic scientist firearms examiner for Ohio BCI, also testified. He opined that the shell casing recovered by OSHP Trooper Rawlings matched the firearm found on Appellant when he was arrested. (Trial Tr. 683-684).

**{¶31}** OSHP Sergeant Shawn Allar testified he was on patrol on January 30, 2024 and responded to the shooting. (Trial Tr. 710). He began processing the scene and

taking photographs. (Trial Tr. 711). He reviewed some of those photographs with the prosecution. (Trial Tr. 722-727). He also collected the casing found by OSHP Sergeant Rawlings and transported it to headquarters so it could be entered into a system where other agencies could respond to see if it matched their casings. (Trial Tr. 715-716). He testified he then submitted the casing for testing with Ohio BCI after the firearm was recovered from Appellant in Michigan. (Trial Tr. 716).

{¶32} OSHP Sergeant Allar also confirmed a black ski mask taken into evidence which belonged to Appellant and was found on his person when he was arrested. (Trial Tr. 778-779). At the end of direct examination, the prosecution asked if OSHP Sergeant Allar had "full confidence as to what [M.B.] said, how it happened, that's how it happened?" (Trial Tr. 833). OSHP Sergeant Allar responded, "I do." (Trial Tr. 833).

## PROCEDURAL HISTORY

{¶33} Appellant was indicted for: attempted murder in violation of R.C. 2923.02(A) and 2903.02(D) and (B), a first-degree felony, with a three-year firearm specification; discharge of a firearm on or near a prohibited premises in violation of R.C. 2923.162(A)(3), a first-degree felony; and felonious assault in violation of R.C. 2903.11(A)(2), a second-degree felony, with a three-year firearm specification. The latter two counts were ultimately dismissed by the State.

{¶34} After a number of continuances and changes in counsel, the public defender's office was assigned as counsel. The attempted murder charge came on for jury trial on July 29, 2025 and concluded on August 1, 2025. The jury returned a verdict finding Appellant guilty of attempted murder, with the firearm specification. On August 25, 2025, the court sentenced Appellant to 14 years in prison.

{¶35} On August 27, 2025, Appellant filed a notice of appeal and asserted seven assignments of error. In his first assignment of error, Appellant asserts:

> **PLAIN ERROR OCCURRED WHEN THE TRIAL COURT PERMITTED M.B.'S VIDEO-TAPED STATEMENT TO BE PLAYED FOR THE JURY WHEN M.B. WAS AN AVAILABLE WITNESS.**

{¶36} Appellant contends the trial court committed plain error by allowing the State to play for the jury the February 2, 2024 recorded interview between the victim and OSHP

Trooper Weaver. The interview occurred three days after the shooting. The State presented the recording during the victim's direct examination. Appellant asserts the recording is hearsay under Evid.R. 801(C) because it contained out-of-court statements made by the victim that were presented into evidence and offered for the truth of the matters asserted.

{¶37} Appellant acknowledges hearsay exceptions, but asserts Evid.R. 801(D)(1)(b), a prior statement by a witness, is the only exception that could apply. He contends this exception does not apply because the recording was not offered to rebut a charge that the victim had fabricated statements or improperly influenced the jury. Appellant notes the victim was not cross-examined until after the recording was played and therefore he was not impeached or discredited.

{¶38} Appellee agrees the plain error standard applies and that the victim's statements to OSHP Trooper Weaver constituted hearsay. Appellee also notes it would not have relied on the prior statement exception to admit the recording because the Rule's requirements were not met. Rather, Appellee contends the present sense impression and excited utterance exceptions apply. Appellee explains that within days, the victim conveyed his present sense impression of the assailant's truck to the investigating officer and its three-letter logo. Appellee asserts the victim's statements were also excited utterances as they were made as a result of a shooting, a startling event that produced nervous excitement, and the victim's spontaneous and non-reflective statement. Appellee contends an excited utterance does not expire a prescribed amount of time after the incident so long as the declarant is still under stress of the event when he makes the statement. Appellee cites *State v. Tomlinson*, 2021-Ohio-1301, ¶ 48 (8th Dist.) and that court's collection of cases allowing excited utterance exceptions when statements were made from 3 days to as many as 27 days after a startling event. Finally, Appellee argues Appellant cannot establish that admitting the recording affected his substantial rights such that the result of the trial would have been different had Appellant's counsel objected to the admission of the recording.

{¶39} Ordinarily, we review trial court rulings on hearsay for an abuse of discretion. *State v. McKelton*, 2016-Ohio-5735, ¶ 97, citing *State v. Hymore*, 9 Ohio St.2d

122, 128 (1967). However, Appellant's counsel did not object to the admission of the recording at trial. Accordingly, plain error is the proper standard of review.

**{¶40}** Crim.R. 52(B) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." An appellate court is not required to correct plain error, as the Rule states that the court need only "notice" plain error. *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). Consequently, the Ohio Supreme Court cautions appellate courts to correct plain error "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.* quoting *State v. Long*, 53 Ohio St.2d, 91 (1978), paragraph three of the syllabus.

**{¶41}** In considering whether plain error has been committed, appellate courts must abide by three limitations under Crim.R. 52(B) to correct an error in the absence of an objection. First, we must find an error, meaning a deviation from a legal rule. *Barnes*, 94 Ohio St.3d at 27, citing *State v. Hill*, 92 Ohio St.3d 191, 200 (2001). Second, the error must be a plain error, meaning an "obvious" defect in the proceedings. *Id.*, citing *State v. Sanders*, 92 Ohio St.3d 245, 257 (2001) (citations omitted). And third, the error must have impacted "substantial rights," meaning that the error affected the outcome of the trial. *Id.* (citations omitted). The party asserting plain error bears the burden of showing that an error occurred, the error was plain, and the error affected the outcome of the trial. *State v. Graham*, 2020-Ohio-6700, ¶ 31.

**{¶42}** Evid.R. 801(C) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted in the statement." Evid.R. 801(D) provides that a statement is not hearsay if:

> (1) Prior statement by witness
>
> The declarant testifies at trial or hearing and is subject to examination concerning the statement, and the statement is (a) inconsistent with declarant's testimony, and was given under oath subject to examination by the party against whom the statement is offered and subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition, or (b) consistent with declarant's testimony and is offered to rebut an express or

implied charge against declarant of recent fabrication or improper influence or motive, or (c) one of identification of a person soon after perceiving the person, if the circumstances demonstrate the reliability of the prior identification.

**{¶43}** Among other hearsay exceptions, Evid.R. 803(1) and (2) state the following:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

(1) Present Sense Impression. A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter unless circumstances indicate lack of trustworthiness.

(2) Excited Utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.

**{¶44}** Both present sense impressions and excited utterances require spontaneity of the statements and a lack of time for a declarant's reflection. *State v. Smith*, 2019-Ohio-3257, ¶ 20 (1st Dist.), citing *State v. Alexander*, 2012-Ohio-460, ¶ 18 (1st Dist.). While passage of time between the statement and the event is relevant, it is not dispositive. *State v. Craig*, 2020-Ohio-1102, ¶ 28 (7th Dist.), quoting *State v. Jones*, 2012-Ohio-5677, ¶ 168. There is no per se amount of time that passes that causes a statement to cease to be considered an excited utterance. *State v. Taylor*, 66 Ohio St.3d 295, 303 (1993). Each case is decided on a case-by-case basis. *Id*.

**{¶45}** Appellee is correct that the court in *Tomlinson*, 2021-Ohio-1301, at ¶ 48, cited cases upholding statements as excited utterances when the statements were made from 10 to 27 days after the incidents. However, these cases involved young children who made statements concerning sexual assaults and their limited reflective abilities. *Id.* at ¶ 48, citing *In re C.C.*, 2007-Ohio-2226 (8th Dist.) (excited utterances of two 4-year-olds 27 days after sexual assault occurred); *State v. Duke*, 1988 WL 88862 (8th Dist. Aug. 25, 1988) (excited utterance of 3-year-old made 10 days after sexual assault). And while the *Tomlinson* Court held in its case that two adult shooting victims made excited

utterances, their statements were made only 40 minutes after the shooting. *Tomlinson* at ¶ 48.

{¶46} Here, the victim's interview with police occurred three days after he was shot in the face. Nevertheless, he could still have been experiencing the startling and lasting effects from a random individual shooting him in the face. The three-day time lapse may also not be all that significant considering that immediately after the shooting, the victim was transported to the emergency room and then transferred to another hospital to have a permanent plate inserted into the right side of his jaw. (Trial Tr. 350-352).

{¶47} In any event, even if the trial court committed obvious error in admitting the recording, it appears the error did not affect the outcome of Appellant's trial. Essentially the same information presented by the victim in the police interview was presented through other witnesses at trial. The victim testified that he noticed a truck slowing down and pulling off in front of his truck as he was checking his engine. (Trial Tr. 300). He recalled a black man with a black mask approaching him as he closed the hood of his truck, asked if he needed help, and then shot him in the face. (Trial Tr. 300-301, 309).

{¶48} Matt Mohr testified he was speaking to the victim by phone when the shooting occurred and the victim told him the shooter was driving a van trailer with three letters on it. (Trial Tr. 251). OSHP Sergeant Jeremy Border testified that as he aided the victim on the scene, the victim told him the person who shot him was driving an over-the-road truck with a white trailer and maybe blue letters on it. (Trial Tr. 291).

{¶49} Moreover, as Appellee notes, Appellant's counsel informed the jury that the three letters on the truck that the victim identified were not the correct letters on Appellant's truck. (Trial Tr. 224, 562, 909). Thus, it appears Appellant was also challenging the victim's credibility through his misidentification of the truck. Thus, the prior inconsistent statement hearsay exception would also apply.

{¶50} Accordingly, we find no merit to Appellant's first assignment of error.

{¶51} In his second assignment of error, Appellant asserts:

**STATE'S EXHIBITS 14 AND 14(A) WERE ADMITTED IN VIOLATION OF THE CONFRONTATION CLAUSE AND HEARSAY RULES AS THE**

**WITNESS WHO WAS CALLED TO AUTHENTICATE THE SAME WAS NOT THE PERSON WHO PREPARED THE EXHIBIT(S).**

**{¶52}** State's Exhibits 14 and 14A were introduced through the testimony of John Hughes, the Old Dominion regional safety manager for the Great Lakes Region. (Trial Tr. 370). He described the forward-facing camera systems installed in each Old Dominion truck and explained that video footage from each truck can be accessed by Old Dominion's corporate offices in North Carolina. (Trial Tr. 372). Mr. Hughes testified that the OSHP requested video from an Old Dominion truck for a specific time from the evening of January 30, 2024 in the relevant Belmont County area with GPS. (Trial Tr. 373-376). He identified Exhibit 14A as the video footage requested and Exhibit 14 was the raw video, both of which he had reviewed. (Trial Tr. 377-378). Mr. Hughes acknowledged he did not compile the videos, explaining that the camera team in the corporate office in North Carolina performs this function. (Trial Tr. 381-382).

**{¶53}** Defense counsel objected to playing the video, asserting no testimony was presented that the videos were kept in the ordinary course of business. (Trial Tr. 379). Defense counsel also argued Mr. Hughes was not the person who compiled the video and thus the defense was unable to cross-examine the creator of the video. (Trial Tr. 379-380). The State responded by asking Mr. Hughes if Old Dominion could produce such videos and whether it had done so in a number of other cases. (Trial Tr. 381). Mr. Hughes testified Old Dominion had such a capability and had done so in the past. (Trial Tr. 381-382).

**{¶54}** Appellant asserts the abuse of discretion applies to a trial court's ruling on the admissibility of evidence and a de novo standard applies to a Confrontation Clause violation. He contends Exhibits 14 and 14A were not properly authenticated under Evid.R. 901(A) and videos and photographs are treated the same under Evid.R. 1001(2). Appellant argues the State failed to qualify these exhibits as business records under Evid.R. 803(6) because Mr. Hughes failed to testify to the regularity and reliability of the business activity involved in creating the record. Appellant submits the videos were not kept in the normal course of business and even if they were, Mr. Hughes was not a "qualified witness" who could authenticate the items.

{¶55} Appellant further asserts the admission of these Exhibits violated the Confrontation Clause because he was unable to cross-examine the individual who prepared them. He notes the individual was never identified and therefore the video and photo could not be authenticated.

{¶56} We find no merit to Appellant's second assignment of error. Rulings regarding authentication are evidentiary rulings and are therefore reviewed for an abuse of discretion. *State v. Haywood,* 2023-Ohio-1121, ¶ 55 (7th Dist.). Abuse of discretion is conduct that is "unreasonable, arbitrary or unconscionable." *Id.*, quoting *State v. Beasley*, 2018-Ohio-16, ¶ 12.

{¶57} Evid.R. 901(A) provides that, "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Evid.R. 901(B) identifies examples of authentication that comply with the Rule. It includes Evid.R. 901(B)(1), which is "[t]estimony of a witness with knowledge. Testimony that a matter is what it is claimed to be."

{¶58} Evid.R. 902(11) provides that certified domestic records of a regularly conducted activity are self-authenticating. The Rule states that:

> The original or a copy of a domestic record that meets the requirements of Evid.R. 803(6), as shown by a certification of the custodian or another qualified person that complies with an Ohio statute or a rule prescribed by the Supreme Court of Ohio. Before the trial or hearing, the proponent must give an adverse party reasonable written notice of the intent to offer the record - and must make the record and certification available for inspection - so that the party has a fair opportunity to challenge them.

{¶59} Authenticating evidence requires a very low bar. *Haywood,* 2023-Ohio-1121, at ¶ 69. There are two methods to authenticate video or photographic evidence. The first is the "pictorial testimony" theory. This occurs when the video or photograph "is merely illustrative of a witness' testimony and must have a sponsoring witness who must testify 'that it is a fair and accurate representation of the subject matter, based on that witness' personal observation.'" *Id.* at ¶ 52, quoting *State v. Green*, 2014-Ohio-648, ¶ 12

(7th Dist.) (citing *Midland Steel Prods. Co. v. U.A.W. Local 486*, 61 Ohio St.3d 121, 129-130 (1991)).

**{¶60}** The second method is the "silent witness" theory. Here, "photographic [or video] evidence may be admitted upon a sufficient showing of the reliability of the process or system that produced the evidence." *Haywood* at ¶ 53, quoting *Midland Steel Prods. Co.* at 130. This method states that "the photographic evidence is a 'silent witness' which speaks for itself, and is substantive evidence of what it portrays independent of a sponsoring witness." *Id.*

**{¶61}** The "silent witness" authentication requires "proof of the reliability of the video recording system, proof of the custody of the video recording, a showing that the evidence has not been altered, and that the video being shown is from the camera system being described." *Haywood* at ¶ 54, citing *Green* at ¶ 13. The person authenticating the footage need not have witnessed the events as they occurred, but must merely be able to "verify that the material is what it purports to be: in this instance, the complete surveillance footage of the incident." *Haywood* at ¶ 54, quoting *Green* at ¶ 14. An equipment user or installer, or an investigating law enforcement officer, may prove the reliability of the video or photo. *Haywood* at ¶ 54, citing *State v. Vermillion*, 2016-Ohio-1295, ¶ 17-20 (4th Dist.).

**{¶62}** In the instant case, Mr. Hughes testified he was the regional safety manager for Old Dominion in its Great Lakes region. (Trial Tr. 370). He explained that Old Dominion installed systems with forward-facing cameras in all of its trucks for safety reasons to show the distance each truck travels between other vehicles on the road. (Trial Tr. 372). He testified he is familiar with the system and has used it for training purposes. (Trial Tr. 373).

**{¶63}** Mr. Hughes further testified he understood the OSHP requested video from Old Dominion trucks passing through Belmont County, Ohio on the evening of January 30, 2024, at a particular time. (Trial Tr. 374-377). He explained that Old Dominion's tracking system allows it to pinpoint a specific area at specific dates and times to see the trucks that pass through the area at a specific time. (Trial Tr. 374). He explained that each truck's video can be obtained and it was done in this case at the request of the OSHP. (Trial Tr. 374-377). He also explained that Old Dominion uses a truck's GPS

system to show the truck's location. (Trial Tr. 376). Mr. Hughes testified he reviewed Exhibits 14 and 14A and Exhibit 14A was the video produced to the OSHP by Old Dominion. (Trial Tr. 377-378). He further testified that the GPS confirmed the video's accuracy that the truck was where the video showed it was. (Trial Tr. 384-385).

{¶64} Based on the low threshold required for authenticity, we find that the trial court did not abuse its discretion in admitting State's Exhibits 14 and 14A. Mr. Hughes was familiar with and used Old Dominion's camera system and GPS, and he was familiar with OSHP's request and the video and photo production to OSHP.

{¶65} Concerning the Confrontation Clause, the Sixth Amendment to the United States Constitution preserves a criminal defendant's right to confront the witnesses against him. *State v. Campbell*, 2024-Ohio-1693, ¶ 61 (8th Dist.), quoting *State v. Johnson*, 2018-Ohio-1389, ¶ 33 (8th Dist.). The Confrontation Clause bars courts from admitting "testimonial hearsay" unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant. *Campbell* at 61, quoting *Crawford v. Washington*, 541 U.S. 36, 68 (2004). A "testimonial statement" is "one made 'under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" *State v. Stahl,* 2006-Ohio-5482, ¶ 36, quoting *Crawford* at 52. Relevant here, plain error is the proper standard of review since Appellant's counsel did not object to this at trial.

{¶66} Courts have held that when a video is played to a jury and it contains no accompanying audio, the Confrontation Clause is not implicated. *Campbell* at ¶ 64 ("No audio was played with the short video clip; therefore, the video did not implicate any statements made by Townsend."); *State v. George*, 2024-Ohio-3123, ¶ 1 (2d Dist.) ("But the surveillance video of the assault contained no audio, and therefore there was no testimonial statements triggering an analysis pursuant to the Confrontation Clause."); *State v. King,* 2024-Ohio-5643, ¶ 30 (5th Dist.)(". . . silent security video . . . did not implicate the Confrontation Clause because no testimonial assertions were included therein.").

{¶67} Similarly here, the video compiled by Old Dominion was played for the jury, but it contained no audio. The Confrontation Clause is therefore not implicated.

Case No. 25 BE 0044

**{¶68}** For these reasons, we find that Appellant's second assignment of error lacks merit and is overruled.

**{¶69}** In his third assignment of error, Appellant asserts:

**THE ELECTRONIC LOG DATA (ELD), AND THE REPORT THEREFROM WERE ADMITTED IN PLAIN ERROR AS SAID DATA WAS NOT PROPERLY AUTHENTICATED.**

**{¶70}** Appellant contends the trial court committed plain error by admitting the ELD and its accompanying report from his truck because they were not properly authenticated. Appellant notes this evidence placed his truck at the scene. He argues that Mr. Jovanovic, the witness who testified at trial as to the ELD devices, merely stated he installed the devices. Appellant submits that Mr. Jovanovic could not retrieve the data from the devices, was not in charge of storing data from those devices, and was sent the data from an unidentified person from Super Ego.

**{¶71}** We find no merit to this assignment of error. We must keep in mind Crim.R. 52(B) provides that we correct plain errors only under exceptional circumstances to correct manifest miscarriages of justice. Ordinarily, abuse of discretion is the standard to apply to trial court rulings on the admissibility of evidence.

**{¶72}** Again, before a court can admit a document or recording into evidence, it must be authenticated under Evid.R. 901 or it must be self-authenticating under Evid.R. 902. *State v. Fowler*, 2024-Ohio-361, ¶ 44 (2d Dist.). Evid.R. 902(11) provides a business records exception to the hearsay rule where records are self-authenticating. The Rule requires that the record must meet Evid.R. 803(6). Evid.R. 803(6) states:

(6) Records of Regularly Conducted Activity. A memorandum, report, record, or data compilation, in any form, of acts, events, or conditions, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness or as provided by Rule 901(B)(10), unless the source of information or the method or

circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

**{¶73}** In *State v. Williamson*, 2021-Ohio-3328, ¶ 62 (7th Dist.), this Court held:

Under the business records exception to the hearsay rule, the witness providing the foundation need not have firsthand knowledge of the transaction. Rather, it must be demonstrated that the witness is sufficiently familiar with the operation of the business and with the circumstances of the record's preparation, maintenance and retrieval, that he can reasonably testify on the basis of this knowledge that the record is what it purports to be, and that it was made in the ordinary course of business consistent with the elements of Evid.R. 803(6). *Bishop v. Munson Transp., Inc*., 109 Ohio App.3d 573, 579, 672 N.E.2d 749, 753 (7th Dist.1996).

**{¶74}** The business record exception was met. Mr. Jovanovic testified as a shop manager employed by Super Ego, the trucking company for which Appellant was driving on the day of the shooting. (Trial Tr. 394-395). Mr. Jovanovic indicated he drove a truck for over ten years before becoming shop manager and he oversees hundreds of Super Ego trucks as shop manager. (Trial Tr. 395). He identified one of his shop manager duties as installing ELDs in the trucks. (Trial Tr. 397). He explained that the federal government mandated installation of ELDs to monitor driving time and mileage in place of log books. (Trial Tr. 396-397).

**{¶75}** Mr. Jovanovic testified that a legal representative from Super Ego requested an ELD report and after checking with his own legal representative, he called the manager from the particular Super Ego region and requested the report. (Trial Tr. 398). He explained that the report was generated from the ELDs that he installed and he had read such reports before. (Trial Tr. 398).

**{¶76}** Mr. Jovanovic indicated that the request by the OSHP was for the idling times of Super Ego trucks for January 30, 2024, but the report he receives is not narrowed down to a specific truck. (Trial Tr. 403). He explained the report is just a "bunch of

information," for that particular date, such as truck VIN numbers, idle times, and locations of those trucks in his fleet. (Trial Tr. 403-405). He testified that the report included the number and idling time for Appellant's truck. (Trial Tr. 403-405).

**{¶77}** He also testified that State's Exhibit 16 was a 22-page document that included Super Ego truck number 2438, Appellant's truck on the relevant date at the relevant time of the shooting. (Trial Tr. 411-412). He indicated that the report showed that Appellant's truck was idle from 10:19:02 p.m. until 10:21:23 p.m. (Trial Tr. 412-413).

**{¶78}** Mr. Jovanovic's testimony suffices to apply the business record exception applicable to Exhibit 16.

**{¶79}** Accordingly, Appellant's third assignment of error lacks merit and is overruled.

**{¶80}** In his fourth assignment of error, Appellant asserts:

**APPELLANT WAS DENIED HIS RIGHT TO A FAIR TRIAL UNDER THE CONSTITUTIONS OF BOTH THE STATE OF OHIO AND THE UNITED STATES WHEN THE DETECTIVE VOUCHED FOR/BOLSTERED THE CREDIBILITY OF THE VICTIM.**

**{¶81}** Appellant contends that part of OSHP Sergeant Allar's testimony during the trial bolstered the credibility of the victim. He challenges the following exchange made at trial between counsel and OSHP Sergeant Allar:

Q [counsel]: Okay. You testified at the very beginning of your testimony that you looked in [M.B.'s] truck, reviewed what was there, tried to find a Bill of Lading, just generally looked around to determine what had happened or if there was any evidence. Do you recall that testimony?

A [Sergeant Allar]: I do.

Q: Based on your investigation, did you find anything that would dispute what [M.B.] said how this crime happened?

A: No.

Q: So you have full confidence as to what he said, how it happened, that's how it happened?

Case No. 25 BE 0044

A: I do.

(Trial Tr. 832-833). Appellant contends counsel's first question was permissible, but he goes on to state that "when the state doubled down, and asked a second time as to the detective's opinion on what M.B. said - specifically if he had confidence that M.B. was telling the truth - the detective crossed the line into impermissible vouching." (Appt. Br. 18).

{¶82} Notably, it was defense counsel who asked OSHP Sergeant Allar the question about which Appellant complains. "Vouching occurs when the prosecutor implies knowledge of facts outside the record or places his or her personal credibility in issue." *State v. Graham*, 2020-Ohio-6700, ¶ 96 (citations omitted).

{¶83} However, even isolating the statements made by OSHP Sergeant Allar, and presuming they were improper vouching, the testimony was harmless. This Court has held that when a jury is able to perceive a witness and decide the credibility of the alleged victim for themselves, the vouching testimony is harmless. *State v. Payne*, 2024-Ohio-5575, ¶ 24 (7th Dist.). Here, the victim testified and was subjected to cross-examination, as was OSHP Sergeant Allar.

{¶84} Accordingly, we find Appellant's fourth assignment of error lacks merit and is overruled.

{¶85} In his fifth assignment of error, Appellant asserts:

**APPELLANT'S RIGHTS UNDER THE CONFRONTATION CLAUSE WERE VIOLATED WHEN THE BCI AGENT TESTIFIED AS TO TESTING PERFORMED BY ANOTHER AGENT WITHOUT SAID AGENT APPEARING AT TRIAL.**

{¶86} Appellant contends the Confrontation Clause was violated when the trial court allowed BCI Agent Andrew McClelland to testify that a second agent performed testing and confirmed his findings that the weapon and cartridge found on Appellant matched the shell casing found on the roadway where the victim was shot. He concedes plain error applies because his counsel failed to object to the testifying BCI agent's testimony.

{¶87} Appellant cites cases holding that *Crawford* does not apply in similar

situations. However, he contends that BCI Agent McClelland's testimony went beyond those cases because he stated the second examiner performed the same test he did and reached the same conclusion. He quotes Agent McClelland's testimony that, "once we reached that conclusion, then we will reduce our findings to writing or we will write a report with our findings in it." (Trial Tr. 656). He submits this testimony inferred not that peer review was completed, but rather that additional testing was performed.

**{¶88}** Appellee asserts the instant testimony is nearly identical to the cases Appellant cites which held *Crawford* inapplicable. Appellee submits that BCI Agent McClelland's testimony was not attempting to introduce testimony by a third-party, but rather was describing the process that BCI uses to verify its results.

**{¶89}** BCI Agent McClelland testified he was a forensic scientist firearms examiner for the Ohio BCI. (Trial Tr. 634). He examines firearms and related components submitted to BCI in criminal investigations. (Trial Tr. 635-637). He estimated he reviewed hundreds to thousands of firearms during his 13-year career in the firearms division. (Trial Tr. 637, 639). He explained the typical question his division answers from those submitting firearms and components is whether the submitted firearm fired the submitted components. (Trial Tr. 639-640).

**{¶90}** BCI Agent McClelland described the chain of custody used by BCI and its information management system. (Trial Tr. 643). He noted that each time a case is submitted, it receives a unique case number and each item submitted receives its own item number, the item numbers are printed off on a barcode, and attached to the packaging of each item. (Trial Tr. 643). He explained that once he tests the firearm and components, he drafts his report, which another firearms examiner reviews to ensure that the technical information is correct and complies with BCI policies and procedures. (Trial Tr. 644).

**{¶91}** BCI Agent McClelland testified that the OSHP submitted a request in this case to determine whether the submitted fired cartridge case was fired by the submitted firearm and unfired cartridges. (Trial Tr. 645). He outlined his testing procedure and concluded that the submitted fired .40 Smith & Wesson cartridge case was fired by the submitted firearm. (Trial Tr. 656). The following exchange then occurred between the prosecution and BCI Agent McClelland:

Case No. 25 BE 0044

Q (prosecution):  Now, did you reduce that to writing?

A (McClelland):  Yes.  But before that, that conclusion is verified by a second examiner.  So once I reach a conclusion, a second examiner will do the exact same microscopic comparison that I do to see if they agree with me or not and.

In this case, that was verified and they did agree with my findings.  Once we reached that conclusion, then we will reduce our findings to writing or we will write a report with our findings in it.

Q:  Essentially, that is BCI striving to be accurate, striving to be correct?

A:  The verification process, yes.

(Trial Tr. 656).

{¶92}  Again, the Sixth Amendment to the United States Constitution preserves a criminal defendant's right to confront the witnesses against him.  *State v. Campbell*, 2024-Ohio-1693, ¶ 61 (8th Dist.), quoting *State v. Johnson*, 2018-Ohio-1389, ¶ 33 (8th Dist.). The Confrontation Clause bars courts from admitting "testimonial hearsay" unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant.  *Campbell* at 61, quoting *Crawford v. Washington*, 541 U.S. 36, 68 (2004).

{¶93}  Appellant attempts to differentiate BCI Agent McClelland's testimony from the testimony challenged in *State v. Hashi*, 2020-Ohio-177 (5th Dist.) and *State v. Glenn*, 2016-Ohio-1447 (5th Dist.).  In *Glenn,* Eric Brown, a Canton police officer, testified the defendant's version of events surrounding a traffic accident could not be correct.  *Id.* at ¶ 11.  Brown was an expert in crash reconstruction and had investigated the crash.  *Id*. He presented at trial a PowerPoint presentation and animated video showing the crash as the defendant claimed it occurred and how he believed it had to have occurred based on his opinion and the evidence.  *Id*.

{¶94}  Brown testified to the procedure he followed in investigating and reconstructing the crash, and he explained his conclusions are peer-reviewed by someone who has nothing to do with the case.  *Glenn* at ¶ 19-20.  Brown indicated that Sergeant Swank, a reconstructionist for the city, reviewed his report alone and then called him back to discuss the report.  *Id*. at ¶ 20.  When Brown was asked if Swank agreed with

Brown's conclusions, Brown testified that he did. *Id.*

**{¶95}** Glenn asserted a Confrontation Clause violation on appeal, asserting the court committed plain error by allowing Brown to testify that Swank agreed with his conclusions and found them accurate. *Id.* at ¶ 18. The Fifth District found no plain error, holding that Brown was the technician and drafter of the report and he testified at trial. *Id.* at ¶ 23. The court explained Swank had nothing to do with the case as the record did not indicate he conducted an independent analysis of the crash or that he had prepared his own report. *Id.*

**{¶96}** In *Hashi*, 2020-Ohio-177 (5th Dist.), BCI forensic scientist Congleton testified to his testing and analysis of that found on the defendant. Congleton testified that other lab personnel ensured "that everything was done appropriately and in a correct manner and to assure they agree with the findings on [his] report when compared to [his] data." *Id.* at ¶ 64. He also explained that a member of management administratively reviewed his work, which resulted in his work being approved. *Id.*

**{¶97}** On appeal, the defendant asserted Congleton violated the Confrontation Clause because he was allowed to present substitute testimony for others who had reviewed and certified his testing and work. *Id.* at ¶ 63. The Fifth District found no Confrontation Clause violation. *Id.* at ¶ 65. The court ruled that the statements made by Congleton relating to review of his work were not testimonial in nature as they referred to the review procedure and what others in the lab did, not what they said. *Id.*

**{¶98}** The testimony Appellant quotes from BCI Agent McClelland is not as clear as the testimony presented by Brown and Congleton in *Glenn* and *Hashi*. However, it suffices to avoid plain error or a Confrontation Clause violation. Agent McClelland described the process and procedures BCI uses before he may submit his report to the requesting party. He was not referring to a second report drafted by a third-party. Rather, he testified to the process used to verify his application of policies and procedures, as well as to check that he followed BCI's formalities of the process BCI Agent McClelland confirmed that the second review is a "verification process," and every case is "[t]echnically reviewed and administratively reviewed before it is released." (Trial Tr. 656, 665, 668-669, 694).

**{¶99}** Accordingly, we find that Appellant's fifth assignment of error lacks merit and is overruled.

**{¶100}** In his sixth assignment of error, Appellant asserts:

**APPELLANT'S RIGHTS TO COUNSEL, AS CONTAINED IN THE CONSTITUTIONS OF BOTH OHIO AND THE UNITED STATES, WERE VIOLATED DUE TO TRIAL COUNSEL'S REPEATED FAILURE TO OBJECT TO THE EVIDENCE DISCUSSED IN ASSIGNMENTS II, IV, V, AND VI.**

**{¶101}** Appellant contends he was denied the effectiveness of counsel because counsel failed to object to the admission of the evidence he highlighted in his assignments of error.

**{¶102}** A claim of ineffective assistance of counsel requires a showing of both deficient performance and resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). If one prong of the *Strickland* test fails, the Court need not consider the other. *State v. Madrigal*, 2000-Ohio-448, ¶ 15. The defendant bears the burden of establishing the ineffective assistance of counsel. *Strickland* at 690.

**{¶103}** A properly licensed attorney in Ohio is presumed competent. *State v. Pettress*, 2019-Ohio-2692, ¶ 11 (7th Dist.). Our review of counsel's decisions is highly deferential because we afford a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Burt v. Titlow*, 571 U.S. 12, 23 (2013), quoting *Strickland* at 689. In order to conclude that counsel was ineffective, "the defendant must overcome the presumption that, under the circumstances, the allegedly ineffective action might be considered sound trial strategy." *Strickland* at 698.

**{¶104}** To show resulting prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland* at 694.

**{¶105}** Regarding the failure of defense counsel to object to the playing of the videotape during the victim's testimony, this appears to be sound trial strategy. Defense counsel actually used the statements in the video to highlight that the victim incorrectly identified the three letters he believed he observed on the perpetrator's truck as DLS,

while Appellant was driving an EGO truck. (Trial Tr. 224, 562, 909). As to failing to object to an alleged Confrontation Clause violation by Mr. Hughes regarding the Old Dominion videotapes, this was also sound trial strategy. Defense counsel sought to establish that those videos failed to confirm that the truck pulled over on the berm in front of the victim's truck was Appellant's truck. Defense counsel also cross-examined Mr. Hughes about whether anyone was seen on the video standing outside of the trucks or whether anyone reported hearing gunshots during that time. (Trial Tr. 388, 390). Mr. Hughes answered no to both questions. (Trial Tr. 388, 390). Defense counsel also stated in closing that the Old Dominion video was only 50 seconds long and in that timeframe, no one reported hearing shots, and no one was seen outside of their trucks at that time. (Trial Tr. 909). Defense counsel was trying to show that while Appellant was around the location seen on the videos, the truck that the victim described from which the perpetrator came did not match the truck described by the victim. (Trial Tr. 909). He also stated that the victim's testimony stated that the crime lasted well over 10-15 minutes and the 50-second video of Old Dominion did not show the crime or that the truck in front of the victim's was the one Appellant was driving. (Trial Tr. 913-914).

{¶106} The same trial strategy applies to defense counsel's failure to object to the ELD evidence. Defense counsel appears to have used the evidence to attempt to establish that Appellant's truck was not the truck pulled over on the berm at the time of the shooting. Defense counsel asked Mr. Jovanovic to confirm, per ELD regulations and "the electronic logging devices frequently asked questions" guide, that when a truck is placed on duty on the ELD, the level of accuracy for determining the location of the truck is within a 1-mile radius, while when the truck is placed on personal use, the accuracy of the location of the truck is within a 10-mile radius. (Trial Tr. 438-439, 907). Defense counsel established that the ELD for Appellant's truck showed he went on personal use at 7:29 p.m. and then went off duty at 11:10 p.m. (Trial Tr. 436). Thus, it was argued that Appellant's truck could not be pinpointed inside of a 10-mile radius during the shooting.

{¶107} The same applies to defense counsel's lack of objection to OSHP Sergeant Allar's alleged vouching for the victim. (Trial Tr. 833). Again, it was defense counsel, not the prosecution, who asked the question that led to Sergeant Allar confirming that he had "full confidence as to what [the victim] said, how it happened, that's how it

happened?" (Trial Tr. 833). In any event, defense counsel strategically used this testimony at closing to agree with Sergeant Allar that the incident probably occurred as the victim described it. However, counsel goes on to attempt to establish how the video evidence, GPS, and ELD could not determine whether Appellant's truck was at the scene at the time of the shooting. (Trial Tr. 911-913).

{¶108} Finally, as explained in assignment of error number five, defense counsel's lack of objection to BCI Agent McClelland testifying as to the verification process was not deficient performance.

{¶109} Accordingly, we find that Appellant's sixth assignment of error lacks merit and is overruled.

{¶110} In his seventh assignment of error, Appellant asserts:

**THE CUMULATIVE EFFECT OF THE ERRORS LISTED ABOVE DEPRIVED APPELLANT OF HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL AS CONTAINED IN THE CONSTITUTIONS OF OHIO AND THE UNITED STATES.**

{¶111} Under the doctrine of cumulative error, "a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal." *State v. Garner*, 74 Ohio St.3d 49, 64 (1995). Thus, if the court finds various single errors to be harmless error, we may reverse based upon the effect of all of these harmless errors together. *State v. Donkers*, 2007-Ohio-1557, ¶ 202 (11th Dist.).

{¶112} A cumulative error analysis is not necessary in this case because we find that none of Appellant's assignments of error are meritorious.

{¶113} Accordingly, we find that Appellant's seventh assignment of error lacks merit and is overruled.

{¶114} For the reasons stated above, the trial court's judgment is hereby affirmed.

Waite, P.J., concurs.

Robb, J., concurs.

Case No. 25 BE 0044

_____

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Belmont County, Ohio, is affirmed.  Costs to be waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure.  It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**